1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  EASTERN DISTRICT OF CALIFORNIA

10

                           ----oo0oo----

11

12   HARRISON ORR, Individually,        CIV. NO. 2:14-585 WBS EFB

13             Plaintiff,               MEMORANDUM AND ORDER RE: CROSS-
                                        MOTIONS FOR SUMMARY JUDGMENT
14        v.

15   CALIFORNIA HIGHWAY PATROL, a
     public entity; STATE OF
16   CALIFORNIA, a public entity;
     CALIFORNIA HIGHWAY PATROL
17   OFFICERS BRAME, PLUMB, and
     DOES 1-10 individually,
18

19             Defendants.

20
                           ----oo0oo----
21

22         Plaintiff Harrison Orr brought this civil rights action

23   against defendants California Highway Patrol (CHP), the State of

24   California, and Officers Brame and Plumb, alleging that his

25   arrest on August 6, 2013 violated state and federal law.  (See

26   First Am. Compl. ("FAC") (Docket No. 5).)  Presently before the

27   court are plaintiff and defendants' cross-motions for summary

28   judgment pursuant to Federal Rule of Civil Procedure 56.

                                  1

I.   Factual and Procedural Background

        Plaintiff is a resident of Citrus Heights, California. (Orr Dep. at 12:15-13:2, 21:1-5 (Docket No. 54-1).)   In September of 2006, plaintiff suffered a brain-stem stroke that forced him to retire from his job at a money-management firm.  (Id. at 21:18-22:10.)   Later, in June 2013, plaintiff suffered transient ischemic attacks or "mini strokes."  (Orr Dep. at 39:19-22; Helm Decl. Ex. 6 ("June 2006 Discharge Summary") (Docket No. 54-6).) The strokes left plaintiff with facial droop, slurred speech, and balancing problems that require him to use a cane.  (Orr Dep. at 26:11-25; Helm Decl. Exs. 11, 14 (Docket Nos. 54-10, 54-13).)   At the time of his arrest in August 2013, plaintiff was 76 years old.

        On August 6, 2013, plaintiff was driving his grey 2005 Toyota southbound on the Interstate 80 Business Loop ("I-80 Business") to his former home in South Sacramento.  (Orr Dep. at 44:10-45:7; Helm Supp. Decl. Ex. 45.)   At that time, Officer Brame was driving a marked patrol car southbound on I-80 Business to transport an arrestee to the Sacramento County Jail.  (Brame Dep. at 63:13-64:5, 65:9-67:9.)   Brame pulled up directly behind plaintiff in the left lane and noticed that plaintiff appeared to be driving too slowly.  (Id. at 67:17-19; Orr Dep. at 62:11-63:23.)   After observing plaintiff make what he believed were several erratic moves, Brame pulled plaintiff over.  (See id. at 87:13-14.)

        Brame collected plaintiff's license and registration and asked plaintiff to get out of the car.  (Orr Dep. at 53:19-22.)   When plaintiff asked what the matter was, Brame asked

2

1   plaintiff if he had been drinking, and plaintiff replied that he

2   had not. (Id. at 53:22-54:1.)  Brame also asked plaintiff if he

3   had taken any drugs or medications that day, and plaintiff

4   responded that he had taken medication for his heart before he

5   left home. (Orr Dep. at 56:15-21.)  It is disputed whether

6   plaintiff also informed Brame that he had suffered a stroke.

7   While plaintiff states he repeatedly informed Brame about the

8   stroke, (Orr Dep. at 56:18-57:6), Brame states plaintiff informed

9   him that he had a neurological condition but does not recall

10  whether plaintiff actually used the word "stroke," (Brame Dep. at

11  103:15-21).

12          Brame became increasingly suspicious of plaintiff after

13  performing two sobriety tests, both of which plaintiff failed.[1]

14  (See Brame Dep. at 91:20-24, 101:3-102:18.)  Brame also noticed

15  that plaintiff's speech was slurred and his pupils were

16  constricted. (Id. at 119:15-19.)  Brame called CHP to request

17  that they send someone with a breathalyzer test, and Officer

18  Plumb soon arrived with the equipment at the scene. (Id. at

19  132:25-133:5.)  The result of plaintiff's test was zero, ruling

20  out alcohol. (Brame Dep. at 107:21-22, 108:1-4.)

21  _____

22          [1]   Brame performed a horizontal gaze nystagmus test where
    he asked plaintiff to follow the tip of his finger with his
23  eyes.[1] (Brame Dep. at 91:20-24.)  Plaintiff's eyes did not
    smoothly track Brame's finger, making Brame suspicious that
24  plaintiff was intoxicated. (Id. at 92:9-12, 96:21-23.)
    Brame also performed the Rhomberg test, which assists
25  in determining a subject's balance and ability to assess the
    passage of time. (Brame Dep. at 101:3-102:18.)  The test
26  involves asking a subject to stand with his feet together, arms
    by his side, close his eyes, and estimate the passage of thirty
27  seconds. (Id.)  Because plaintiff was unable to maintain his
    balance, Brame discontinued the test. (Id.)

28

                                    3

1    Still suspicious that plaintiff could be under the

2  influence of drugs, Brame and Plumb decided to place plaintiff

3  under arrest for driving under the influence.  (Id. at 118:23-

4  119:1.)  Brame made arrangements for a certified drug recognition

5  expert to conduct a further evaluation of plaintiff at the CHP

6  office to rule out whether or not drugs were the cause of his

7  appearance and behavior.  (Id. at 116:19-22.)

8    Plaintiff initially cooperated with the arrest.

9  However, when Brame informed plaintiff that he would have to be

10  handcuffed, plaintiff states he told the officers that he could

11  not be handcuffed because he had problems balancing.  (Orr Dep.

12  at 63:3-4.)  After some discussion, plaintiff and the officers

13  reached an impasse.  Plumb communicated to Brame that they would

14  need to take plaintiff down, and in a matter of seconds Plumb

15  punched plaintiff in his right ribs and knocked him to the

16  ground.  (Orr Dep. at 65:12-20; Plumb Dep. at 30:23-25.)  The

17  officers handcuffed plaintiff behind his back and lifted

18  plaintiff off the ground.  (Orr Dep. at 70:18-23; Brame Dep. at

19  152:22-153:2.)

20    Sargeant Kelly, who had arrived at the scene,

21  transported plaintiff to the CHP office.  (Kelly Dep. at 14:8-10

22  (Docket No. 54-4).)  There, Officer Hannem performed an hour-long

23  drug-recognition evaluation on plaintiff and ultimately

24  determinaed plaintiff was a "medical rule-out," meaning that in

25  his opinion, plaintiff's condition was due to a medical condition

26  as opposed to drug use or alcohol.  (Id. at 54:14-17, 58:6-12.)

27    At 4:40 p.m. plaintiff was booked at the Sacramento

28  County jail for willfully resisting an officer in violation of

1  California Penal Code section 148(a).  (Helm Decl. Ex. 19 at 8

2  (Docket No. 54-18) (noting plaintiff was transported to

3  Sacramento County Jail and booked for a "148(a) PC at 1640

4  hours").)  Plaintiff was released sometime between 12:30 and 1

5  a.m.  (Orr Dep. at 89:18-21.)

6          As a result of his arrest, plaintiff asserts he

7  sustained substantial bruising to his body, endured pain, and

8  took six to seven weeks to heal.  (Orr Dep. at 32:25-33:2, 92:23-

9  102:4; Helm Decl. Ex. 33.)  Plaintiff brought claims against

10  Officers Brame and Plumb for (1) unreasonable search and seizure

11  and excessive force in violation of the Fourth Amendment, 42

12  U.S.C. § 1983; (2) interference with plaintiff's enjoyment of his

13  rights, Cal. Civ. Code § 52.1; (3) interference with plaintiff's

14  right to be free from violence or intimidation, Cal. Civ. Code §

15  51.7; (4) assault and battery; (5) negligence; (6) Elder Abuse,

16  Cal Welfare & Insts. Code § 15610.07; and (7) false arrest.  (See

17  First Am. Compl. (Docket No. 5).)  Plaintiff also brought claims

18  against the California Highway Patrol and the State of California

19  under the American with Disabilities Act ("ADA") and

20  Rehabilitation Act ("RA").  Both parties both move for summary

21  judgment pursuant to Federal Rule of Civil Procedure 56.[2]

22  Because plaintiff does not contest summary judgment on his claim

23  under section 51.7, the court need not discuss it and will enter

24  judgment in favor of defendants on that claim accordingly.

25  

26          [2]   Plaintiff moved for summary judgment on all claims
   except his claim under California Civil Code section 51.7.  (See
27  Pl.'s Mot. at 1 (Docket No. 50).)  In his opposition, plaintiff
   states that to simplify and streamline this case, he does not
28  contest summary judgment on his section 51.7 claim.

1  II. Defendants' Request for Judicial Notice

2          Federal Rule of Evidence 201 permits the court to take

3  judicial notice of a fact not subject to reasonable dispute

4  because either it "(1) is generally known within the [] court's

5  territorial jurisdiction; or (2) can be accurately and readily

6  determined from sources whose accuracy cannot reasonably be

7  questioned."  Fed. R. Evid. 201(b).

8          Defendants request that the court take judicial notice

9  of the "fact" that expert Roger Clark's opinions as a Police

10 Procedures Consultant have been found to be ipse dixit in a

11 number of cases decided in various federal district and appellate

12 courts.  (See Defs.' Req. for Judicial Notice at 1-3 (Docket No.

13 58).)  Other courts' discussions of Clarks' opinions in other

14 cases are not a proper subject for judicial notice.  While a

15 court may take judicial notice of another court's opinion, it may

16 do so for the existence of the opinion only, and not for the

17 truth of the facts recited therein.  Lee v. City of Los Angeles,

18 250 F.3d 668, 690 (9th Cir. 2001), impliedly overruled on other

19 grounds as discussed in Gallardo v. Dicarlo, 203 F.Supp.2d 1160,

20 1162 n.2 (C.D. Cal. 2002).  Furthermore, whether in other cases

21 courts have found Clark's opinion to be ipse dixit has no bearing

22 on the instant case with its particularized facts and

23 circumstances.

24 III. Analysis

25     A. Summary Judgment Standard

26          Summary judgment is proper "if the movant shows that

27 there is no genuine dispute as to any material fact and the

28 movant is entitled to judgment as a matter of law."  Fed. R. Civ.

1  P. 56(a).  A material fact is one that could affect the outcome

2  of the suit, and a genuine issue is one that could permit a

3  reasonable jury to enter a verdict in the non-moving party's

4  favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

5  (1986).  The party moving for summary judgment bears the initial

6  burden of establishing the absence of a genuine issue of material

7  fact and can satisfy this burden by presenting evidence that

8  negates an essential element of the non-moving party's case.

9  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

10 Alternatively, the moving party can demonstrate that the non-

11 moving party cannot produce evidence to support an essential

12 element upon which it will bear the burden of proof at trial.

13 Id.

14      Once the moving party meets its initial burden, the

15 burden shifts to the non-moving party to "designate 'specific

16 facts showing that there is a genuine issue for trial.'"  Id. at

17 324 (quoting then-Fed. R. Civ. P. 56(e)).  To carry this burden,

18 the non-moving party must "do more than simply show that there is

19 some metaphysical doubt as to the material facts."  Matsushita

20 Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

21 "The mere existence of a scintilla of evidence . . . will be

22 insufficient; there must be evidence on which the jury could

23 reasonably find for the [non-moving party]."  Anderson, 477 U.S.

24 at 252.

25      In deciding a summary judgment motion, the court must

26 view the evidence in the light most favorable to the non-moving

27 party and draw all justifiable inferences in its favor.  Id. at

28 255.  "Credibility determinations, the weighing of the evidence,

1  and the drawing of legitimate inferences from the facts are jury

2  functions, not those of a judge . . . ruling on a motion for

3  summary judgment . . . ."  Id.  On cross-motions for summary

4  judgment, the court "must review the evidence submitted in

5  support of each cross-motion [in a light most favorable to the

6  non-moving party] and consider each party's motions on their own

7  merits."  Corbis Corp. v. Amazon.com, Inc., 351 F. Supp. 2d 1090,

8  1097 (W.D. Wash. 2004).

9       Both parties filed formulaic and conclusory objections

10  to evidence submitted by the other party.  "Objections to

11  evidence on the ground that the evidence is irrelevant,

12  speculative, argumentative, vague and ambiguous, or constitutes

13  an improper legal conclusion are all duplicative of the summary

14  judgment standard itself."  Century 21 Real Estate LLC v. All

15  Prof'l Realty, Inc., 889 F. Supp. 2d 1198, 1215 (E.D. Cal. 2012)

16  (citing Burch v. Regents of the Univ. of Cal., 433 F. Supp. 2d

17  1110, 1119-20 (E. D. Cal. 2006)).  "Similarly, statements based

18  on speculation, improper legal conclusions, personal knowledge,

19  or argumentative statements are not facts and can only be

20  considered as arguments, not as facts, on a motion for summary

21  judgment."  Id.

22       In the interest of brevity, the court will not review

23  the substance or grounds of the individual objections here.  The

24  parties' objections are all overruled.

25     B. Section 1983 Claims for Violation of the Fourth Amendment

26       Section 1983 "is not itself a source of substantive

27  rights, but a method for vindicating federal rights elsewhere

28  conferred by . . . the United States Constitution and federal

8

1   statutes that it describes." Baker v. McCollan, 443 U.S. 137,

2   144 n.3 (1979).   Plaintiff's § 1983 claims against Brame and

3   Plumb are based on their alleged unlawful arrest of plaintiff and

4   their use of excessive force in violation of the Fourth

5   Amendment.  (See FAC ¶ 35.)

6           1.  Unlawful Arrest

7           a. The Violation

8           The Fourth Amendment to the United States Constitution,

9   applicable to the states through the Fourteenth Amendment,

10  prohibits searches and arrests without probable cause.  Beck v.

11  Ohio, 379 U.S. 89, 90-91 (1964); McKenzie v. Lamb, 738 F.2d 1005,

12  1007-08 (9th Cir. 1984).  "The long-prevailing standard of

13  probable cause protects 'citizens from rash and unreasonable

14  interferences with privacy and from unfounded charges of crime.'"

15  Maryland v. Pringle, 540 U.S. 366, 370 (2003) (quoting Brinegar

16  v. United States, 338 U.S. 160, 176 (1949)).

17          "Probable cause exists when, under the totality of the

18  circumstances known to the arresting officers, a prudent person

19  would have concluded that there was a fair probability that [the

20  suspect] had committed a crime." United States v. Ortiz, 427

21  F.3d 567, 573 (9th Cir. 2004).  "While conclusive evidence of

22  guilt is of course not necessary under this standard to establish

23  probable cause, '[m]ere suspicion, common rumor, or even strong

24  reason to suspect are not enough.'" United States v. Lopez, 482

25  F.3d 1067, 1072 (9th Cir. 2007) (quoting McKenzie v. Lamb, 738

26  F.2d 1005, 1008 (9th Cir. 1984)).  "The probable cause inquiry is

27  an objective one, focusing on the facts known to the officer at

28  the scene." Fowler v. Cal. Highway Patrol, Civ. No. 3:13-1026,

1    2014 WL 1665046, at *6 (N.D. Cal. Apr. 25, 2014) (citing

2    Devenpeck v. Alford, 543 U.S. 146, 153 (2004)).  "The arresting

3    officers' subjective intention . . . is immaterial in judging

4    whether their actions were reasonable for Fourth Amendment

5    purposes."  Lopez, 482 F.3d at 1072.

6         Once there is probable cause for an arrest, it can

7    dissipate:

8        If probable cause is established at any early stage of
9        the   investigation,   it   may   be   dissipated   if   the
         investigating    officer    later    learns    additional
10       information  that  decreases  the  likelihood  that  the
         defendant  has  engaged,  or  is  engaging,  in  criminal
11       activity.   A  person  may  not  be  arrested,  or  must  be
         released   from   arrest,   if   previously   established
12       probable  cause  has  dissipated.   "As  a  corollary  . . .
         of  the  rule  that  the  police  may  rely  on  the  totality
13       of  facts  available  to  them  in  establishing  probable
         cause,  they  also  may  not  disregard  facts  tending  to
14       dissipate probable cause."

15

16   Ortiz, 427 F.3d at 574 (quoting Bigford v. Taylor, 834 F.2d 1213,

17   1218 (5th Cir. 1988)).

18        The Ninth Circuit has distinguished between litigating

19   probable cause in the criminal and civil contexts.  See McKenzie,

20   738 F.2d at 1008.  "[I]n a § 1983 action the factual matters

21   underlying the judgment of reasonableness generally mean that

22   probable cause is a question for the jury, and summary judgment

23   is appropriate only if no reasonable jury could find that the

24   officers did or did not have probable cause to arrest."  Id.

25        Plumb and Brame arrested plaintiff for driving under

26   the influence, which is a misdemeanor.[3]  (Brame Dep. at 118:20-

27

28        [3]   Defendants argue that Brame and Plumb had probable
     cause for arresting plaintiff for resisting arrest, (see Defs.'

119:3.)  Brame's suspicion of plaintiff arose from a number of
known facts.  Plaintiff was driving below the speed limit in the
far left lane of traffic and was at one point straddling the lane
divider as he attempted to move to the shoulder.  (See Orr Dep.
at 48:2-5; MVARS video; Brame Dep. 87:13-14.)  Based on Brame's
experience, driving at a slow speed is a key indicator that a
driver is intoxicated.  (Brame Dep. at 70:18-23.)  Brame also
states he observed plaintiff cutting off a vehicle while changing
lanes.  (Id. at 75:21-76:2.)

Plaintiff's appearance and behavior also led Brame to
believe plaintiff had ingested a narcotic.  The way plaintiff's
eyes failed to track Brame's finger, plaintiff's slurred speech,
and his poor balance could indicate drug use.  (Id. at 109:4-24,
119:11-22.)  Plaintiff's constricted pupils was also potentially
a sign that plaintiff was under the influence of drugs;
defendants' expert Kevin Craig, an instructor in the Impaired
Driving Unit at the CHP Academy, states that most non-narcotic
causes of abnormal pupil constriction such as eye injury or old
age will cause only one eye to constrict.  (Craig Decl. ¶ 12.)
According to Brame, both of plaintiff's eyes were constricted.

Mem. at 21-22), but this begs the question, because plaintiff
could not have resisted arrest prior to the time he was arrested.
For that initial arrest to be lawful, the officers must have had
probable cause to believe plaintiff had driven under the
influence.  See Fowler, 2014 WL 1665046, at *6 (holding that
arrest for resisting arrest was supported by probable cause if
there was probable cause to believe plaintiff had committed
another arrestable offense).

1  (See Brame Dep. at 119:16-19.)

2         Plaintiff's constricted pupils, however, were an
3  equivocal sign that plaintiff had ingested drugs.  The CHP manual
4  states that a head injury could cause constricted pupils.  (See
5  Helm Decl. Ex. 36 at 2-13, 3-7.)  It states, vaguely, that "most"
6  non-narcotic analgesic conditions, including eye injury or old
7  age, will cause only one eye to constrict.  Id.  Neither Craig's
8  statement nor the manual indicate that a neurological condition
9  such as a stroke should only result in unilateral, rather than
10  bilateral constriction.  (See id. at 3-7.)  In discussing his
11  examination of plaintiff at the CHP office, Officer Hannem stated
12  that he had been trained that the kind of constriction plaintiff
13  exhibited could be the result of either a stroke or drug use.
14  (See Hannem Dep. at 56:4-11.)

15         In addition to these facts, there were a number of
16  signs--some disputed--that plaintiff's condition resulted from a
17  medical condition.  It is disputed whether plaintiff told Brame
18  he had previously suffered from a stroke.[4]  (Orr Dep. at 56:15-
19  21, 69:13-18.).  At the time of the accident, plaintiff's stroke
20  had left him with a facial droop. (See Helm Decl. Ex. 8
21  ("Plaintiff's Booking Photo"); Hannem Dep. at 42:23-24.)  The
22  Peace Officer Standards and Training ("POST") Academy teaches
23  officers that indicators of stroke include "sagging facial
24  muscles," "poor balance, clumsiness," and "impaired, slurred
25  speech."  (Helm Decl. Ex. 22 ("POST Manual on First Aid and

26  —————————————
          [4]    Brame states plaintiff told him he suffered from a
27  "neurological condition" but could not recall whether plaintiff
   actually used the word "stroke."  (Brame Dep. at 112:8-10, 11:1-
28  3.)

1   CPR").)  A jury could therefore conclude that a reasonable

2   officer would know that plaintiff's "droopy" face, poor balance,

3   and clumsiness could indicate that plaintiff had suffered a

4   stroke.  If it is true that plaintiff asserted that he informed

5   the officers on multiple occasions about his stroke, then his

6   physical symptoms would have corroborated his representations.

7          There were several other indicators beyond plaintiff's

8   physical condition suggesting that plaintiff had disabilities.

9   Plaintiff's car had a license plate for people with disabilities,

10  (see Helm Decl. Ex. 4), and Brame saw the plate when he ran it

11  with the dispatcher.[5] (Brame Dep. at 106:23-25)  Brame found

12  plaintiff's cane in the trunk of his car while he was looking for

13  drugs.  (See id. at 180:3-9.)  Although Brame states that found

14  the cane after his arrest of plaintiff, where probable cause has

15  dissipated after an arrest due to newly discovered facts, the

16  arrestee must be released, see Ortiz, 427 F.3d at 574.

17         Despite these additional facts that a jury could find

18  would have suggested to a reasonable officer that several of

19  plaintiff's symptoms were attributable to a medical condition,

20  Brame states he believed he could not take plaintiff's word about

21  his neurological issues.  When asked if he doubted plaintiff when

22  plaintiff told him he had a previous neurological condition,

23  Brame testified, "I couldn't take [plaintiff's] word as gospel; I

24  had to obviously do my investigation to figure that out."  (Brame

25  Dep. at 113:2-5.)  Brame, however, failed to do any investigation

26         [5]    Defendants assert that plaintiff was not the registered

27  owner of his car, but plaintiff's DMV registration indicates that
    plaintiff is a registered co-owner, along with Demetra Thomason.

28  (See Helm Decl. Ex. 46.)

1    to determine whether plaintiff had a medical condition, including

2    asking plaintiff any questions about his neurological condition.

3    Instead Brame merely "[went] through the field sobriety test,"

4    (see Brame Dep. at 113:6-20), the purpose of which was to detect

5    drug use.

6         "Probable cause means 'fair probability," but it does

7    not mean "'certainty or even a preponderance of the evidence.'"

8    United States v. Gourde, 440 F.3d 1065, 1069 (9th Cir. 2006)

9    (quoting Illinois v. Gates, 462 U.S. 213, 246 (1983)).  "Once a

10   police officer has a reasonable basis for believing there is

11   probable cause, he is not required to explore and eliminate every

12   theoretically plausible claim of innocence before making an

13   arrest."  See Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128

14   (9th Cir. 1997) (holding that where there was evidence that

15   plaintiff had attacked a police officer, the arresting officer

16   was not required to believe plaintiff, rather than the officer,

17   that plaintiff had acted in self-defense); see also Fowler, 2014

18   WL 1665046, at *9 (holding that officer was not required to take

19   into account plaintiff's representation that her stroke-related

20   disabilities made it difficult for her to comply with his

21   instructions, where those disabilities "were not readily

22   verifiable" at the moment she resisted arrest).

23        Here, however, a reasonable jury could conclude that

24   plaintiff's medical condition was not a "theoretical" claim of

25   innocence.  There were facts known to Brame at the time of

26   plaintiff's arrest that made plaintiff's stroke readily

27

28

                                   14

1  verifiable.  Plaintiff's facial droop, his cane,[6] his license

2  plate for disabled persons could have "overcome" or "chipped

3  away" at the fair probability that plaintiff's condition was the

4  result of disabilities associated with stroke, and not drug use.

5  See Ortiz, 427 F.3d at 574; Fowler, 2014 WL 1665046, at *9.

6  Under Ortiz, a reasonable jury could find that Brame was not

7  entitled to disregard these facts which dissipated probable cause

8  that plaintiff was under the influence of drugs.  See Ortiz, 427

9  F.3d at 574.

10         Moreover, it is telling that Officer Hannem, after

11  conducting a nearly identical investigation to Brame's at the CHP

12  office, with the same known facts available to him, concluded

13  that under the totality of the circumstances plaintiff's symptoms

14  were consistent with plaintiff's reported history of having been

15  a stroke victim.  (Hannem Dep. at 57:24-58:12.)  Plaintiff,

16  Hannem concluded, was a "medical rule-out."  (Id.)  On the other

17  hand, Hannem was a certified drug recognition expert, (Hannem

18  Dep. at 64:7-19), and although Brame had also been certified in

19  that role, he permitted his certification to lapse, (Brame Dep.

20  at 121:1-16).  CHP policy also provides that DRE evaluations

21  should be conducted in a controlled environment with minimal

22  distractions and controllable lighting conditions.  (See Craig

23  Decl. ¶ 12.)  A reasonable jury could find that Hannem's current

24  certification and the controlled environment of the CHP office

25  either did or did not make a difference in Hannem's

26  ────────────────
        [6]    As previously discussed, although Brame discovered
27  plaintiff's cane after plaintiff was placed in handcuffs, a
    reasonable jury could find the cane further dissipated probable
28  cause.  See Ortiz, 427 F.3d at 574.

1  classification of plaintiff as a medical rule-out.

2         From the totality of the known facts, a reasonable jury

3  could find that probable cause was lacking when the officers

4  informed plaintiff he was being placed under arrest.[7]  See

5  McKenzie, 738 F.2d at 1008 (noting that in § 1983 cases the

6  judgment of reasonableness generally means that a probable cause

7  is a question for the jury).  Because a number of material facts

8  are in dispute, granting summary judgment to either party on

9  plaintiff's unlawful arrest claim against the officers is

10  inappropriate at this time.  See id.

11              b. Qualified Immunity

12         Defendants raise the defense of qualified immunity.

13  (See Defs.' Mot. at 27.)  In suits under § 1983, "qualified

14  immunity protects government officials 'from liability for civil

15  damages insofar as their conduct does not violate clearly

16  established statutory or constitutional rights of which a

17  reasonable person should have known.'"  Pearson v. Callahan, 555

18  U.S. 223, 232 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800,

19  818, (1982)).  "In resolving the claim of qualified immunity, the

20

21         [7]    "A person 'subjects' another to the deprivation of a
constitutional right, within the meaning of section 1983, if he
22  does an affirmative act, participates in another's affirmative
acts, or omits to perform an act which he is legally required to
23  do that causes the deprivation of which complaint is made."
Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).  Officer
24  Plumb participated in the arrest of plaintiff with the same facts
available to him that were available to Officer Brame.  (See
25  Plumb Dep. at 25:23-24 (describing that both officers flanked
plaintiff upon his arrest; Plumb Dep. at 19:11-20:25 (describing
26  facts known to him at the time of plaintiff's arrest).)  Because
there exists a reasonable dispute of material fact as to whether
27  plaintiff's arrest was lawful, plaintiff also has a viable
unlawful arrest claim against Plumb.

28

court must determine whether, taken in the light most favorable to plaintiff, defendants' conduct violated a constitutional right, and if so, whether the right was clearly established." Kinnamon v. Latia, Civ. No. 1:12-1325 AWI DLB, 2015 WL 590617, at *6 (E.D. Cal. Feb. 12, 2015) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).  Defendants bear the burden of establishing qualified immunity.  See Moreno v. Baca, 431 F.3d 633, 638 (9th Cir. 2005).  The Supreme Court has held that a court may assume the existence of a constitutional violation under the first inquiry for purposes of the qualified immunity analysis. Pearson, 555 U.S. at 236.  The court has already found that disputed issues of fact exist regarding whether defendants Brame and Plumb arrested plaintiff without probable cause in violation of the Fourth Amendment.

Assuming there was a Fourth Amendment violation, the court proceeds to the clearly established inquiry.  This inquiry "serves the aim of refining the legal standard and is solely a question of law for the judge."  Tortu v. Las Vegas Metro. Police Dep't, 556 F.3d 1075, 1085 (9th Cir. 2009).  As the Supreme Court has recognized, whether the unlawfulness of certain conduct is clearly established "depends largely 'upon the level of generality at which the relevant legal rule is to be identified.'"  Wilson v. Layne, 526 U.S. 603, 614 (1999) (quoting Anderson v. Creighton, 483 U.S. 635, 639 (1987)).  The right must be defined in a "particularized, and hence more relevant, sense," requiring a court to strike a balance between defining a right too generally so that the definition necessarily leads to the conclusion that the right is clearly established and defining the

1  right too narrowly so that prior precedent must mirror the facts

2  of the case in order to conclude that the right has been clearly

3  established.  Saucier, 533 U.S. at 202-03.  If the court

4  concludes a right is not clearly established, the officer is

5  entitled to qualified immunity.  Id. at 202.

6      Here, the issue is whether it is clearly established

7  that an officer lacks probable cause to arrest someone for

8  driving under the influence where there is a readily verifiable

9  innocent explanation for symptoms of drug use.  It is well

10  established that "[t]he effect of evidence which may support, or

11  incline toward, a finding of probable cause can, of course, be

12  vitiated by countervailing evidence."  Lopez, 482 F.3d at 1074

13  (citing Ortiz, 427 F.3d at 527).  It was thus clearly established

14  that even if the officers believed plaintiff was driving under

15  the influence, they were not entitled to ignore countervailing

16  facts that overcame this belief, including plaintiff's assertion

17  that he had suffered from a stroke, was on medication, and the

18  aforementioned facts suggesting plaintiff was disabled.

19      In addition to circuit precedent, a court may also

20  consider police policy to determine whether a police officer was

21  on notice that his behavior violated the constitution.  See

22  Drummond v. City of Anaheim, 343 F.3d 1052, 1061-62 (9th Cir.

23  2003) (holding that officers were not entitled to qualified

24  immunity even absent Ninth Circuit precedent squarely on point

25  where "the officers received training from their own police

26  department explaining specifically" that the force they applied

27  could cause death).

28      The California Highway Patrol training manual

anticipates the danger that certain medical conditions could risk

subjecting an innocent person to arrest.  The training manual

states,

> (f)  Many  times  a  subject  may  appear  obviously
> impaired.   There  are  other  circumstances,  such  as
> medical  conditions,  that  may  cause  a  person  to  show
> signs  and  symptoms  that  are  consistent  with  alcohol
> and/or  drug  impairment.   Some  of  these  conditions
> include . . . (3) Injuries or diseases of the nervous
> system; (4) head injuries. . . .
>
> (g)  It  is  imperative  that  the  possibilities  of  such
> conditions  be  explored  and  ruled  out  to  prevent  the
> arrest  of  innocent,  sober  persons,  and  to  prevent  a
> person who is injured from being subjected to further
> aggravation and/or lack of medical attention.
>
> (h) While the presence, or alleged presence, of any of
> the  above  conditions  does  not  negate  the  giving  of  a
> further  and  more  complete  examination  by  the  officer,
> the  subject's  condition  may  require  immediate  medical
> attention.   If  the  officer  suspects  a  medical
> condition  exists  and  treatment  may  be  needed,  the
> officer  should  immediately  arrange  for  medical
> treatment.

(Helm Decl. Ex. 24 at 2-7 ("CHP Training Manual").)  This policy

places officers on notice that some medical conditions could put

individuals at risk of being arrested for driving under the

influence of drugs when there was an entirely innocent

explanation for his appearance and behavior.  It is unclear

whether plaintiff's stroke constitutes an "injur[y] to the

nervous system" or a "head injury," both of which the manual

single out as conditions needing immediate assistance.  In any

case, the policy teaches the importance of being perceptive to

countervailing facts indicating a medical condition, and not drug

1   use, is the cause of a person's behavior and appearance.  As

2   previously discussed, a jury could find that, once aware that

3   plaintiff's symptoms could be stroke-, and not drug-induced, the

4   officers asked no further questions and even ignored other

5   evidence that plaintiff was disabled.  (See Brame Dep. at 113:6-

6   20, 156:14-15; 180:5-9.)

7   　　　　　Together, Lopez and CHP policy clearly establish that

8   an officer lacks probable cause to arrest someone for driving

9   under the influence where there is a readily verifiable innocent

10   explanation for symptoms of drug use.  Because it remains a

11   disputed issue of fact whether plaintiff's medical condition was

12   readily verifiable, defendants are not entitled to qualified

13   immunity at this stage.  See Lopez, 482 F.3d at 1074.

14   　　　　　Defendants rely on Fowler, a case also involving the

15   arrest of a stroke victim, to argue that because there a district

16   court judge ruled the officers did not violate the Fourth

17   Amendment, then it is not clearly established that a claim of a

18   previous stroke immunizes a plaintiff from an arrest. (See Defs.'

19   Reply at 12); 2014 WL 1665046.  Fowler applied Ortiz to facts

20   similar to those here.  See id.

21   　　　　　Fowler is distinguishable in key respects.  In Fowler,

22   police attempted to arrest plaintiff for public intoxication, but

23   she refused to stay in her vehicle when the officers asked her to

24   do so.  Id. at *1-*2.  Plaintiff states she yelled at the

25   officers that her disability stemming from a stroke made it

26   difficult for her to understand directions and her surroundings.

27   Id. at *9.  No other facts suggested the plaintiff had a

28   disability.  The court found that this was not an Ortiz

20

1  "dissipation" situation because plaintiff's statements alone

2  could not overcome the fair probability that plaintiff had

3  willingly refused to comply with the instructions.  See id.

4       Here, however, a reasonable jury could find that the

5  officers had facts in addition to plaintiff's statement that he

6  had had a stroke--his physical appearance, including his facial

7  droop, his disabled persons license plate, and his cane, which

8  Brame discovered post-arrest while searching plaintiff's car on

9  the scene for drugs.  A reasonable jury could find that

10  plaintiff's condition, unlike Fowler's, was "readily verifiable"

11  and facts indicating plaintiff's medical condition should have

12  overcome the fair probability that plaintiff was acting under the

13  influence of drugs.  There are thus factual disputes that prevent

14  the court from deciding qualified immunity at this stage.

15       2. Excessive Force

16            a. The Violation

17       The Fourth Amendment also governs plaintiff's excessive

18  force claim, but unlawful arrest and excessive force claims

19  require different inquiries.  Beier v. City of Lewiston, 354 F.3d

20  1058, 1064 (9th Cir. 2004); see also id. ("Because the excessive

21  force and false arrest factual inquiries are distinct,

22  establishing a lack of probable cause to make an arrest does not

23  establish an excessive force claim, and vice-versa.").  A court

24  must determine whether "the officers' actions are 'objectively

25  unreasonable' in light of the facts and circumstances confronting

26  them, without regard to their underlying intent or motivation."

27  Id. at 397.  In Graham the Supreme Court articulated three

28  factors that courts should typically consider in an excessive

21

1   force analysis: "(1) the severity of the crime at issue; (2)

2   whether the suspect poses an immediate threat to the safety of

3   the officers or others; and (3) whether the suspect is actively

4   resisting arrest or attempting to evade arrest by flight."

5   Cameron v. Craig, 713 F.3d 1012, 1021 (9th Cir. 2013) (citing

6   Graham, 490 U.S. at 396).  In addition to these factors, "a court

7   (or jury) may 'look to whatever specific factors may be

8   appropriate in a particular case.'"  (Id.) (quoting Franklin v.

9   Foxworth, 31 F.3d 873, 875-76 (9th Cir. 1994)).

10          Ultimately, "[d]etermining whether a police officer's

11  use of force was reasonable or excessive therefore requires

12  careful attention to the facts and circumstances of each

13  particular case and a careful balancing of an individual's

14  liberty with the government's interest in the application of

15  force." Santos v. Gates, 287 F.3d 846, 853 (9th Cir. 2002)

16  (internal quotation marks and citation omitted).  Whether an

17  officer used excessive force under the Fourth Amendment is a

18  question for the jury, which "almost always turn[s] on a jury's

19  credibility determinations."  See id.  "Because [the excessive

20  force balancing test] requires a jury to sift through disputed

21  factual contentions, and to draw inferences therefrom, we have

22  held on many occasions that summary judgment . . . in excessive

23  force cases should be granted sparingly."  Id.

24          Plaintiff's excessive force claim against the officers

25  centers on Plumb's punch of plaintiff in his right rib--what

26  defendants call a "distraction punch," (see Defs.' Mot. at 34)--

27  and the officers' forceful takedown of plaintiff to the ground.

28

                                22

1   The occurrence of both actions is undisputed.[8]  (See Orr Dep. at

2   65:12; Plumb Dep. at 30:23-25, 148:24-147:4.)

3          However, the parties characterize differently the

4   degree of force used.  Plumb states that he "struck" plaintiff in

5   the lower ribs with a closed fist but not in a forceful manner,

6   choosing not to hit plaintiff harshly because of his age.  (Plumb

7   Dep. at 32:13-33:18.)  During the takedown, Plumb says the

8   officers "placed" plaintiff on the ground in order to lessen the

9   impact.  (Id. at 36:6-16.)  Plaintiff, on the other hand,

10  describes the officers' acts much more violently, testifying that

11  Plumb punched him in the ribs, and Brame kicked his feet out from

12  under him and forced him to the ground in a matter of seconds,

13  such that he had trouble breathing.  (Orr Dep. at 69:3-18.)  The

14  officers called the fire department, and paramedics found

15  plaintiff's condition to be stable, (Pass Decl. Ex. Q at 1

16

17          [8]   Plumb delivered the punch to plaintiff's ribs, and
    Brame initiated the takedown by kicking plaintiff's shin.  (See
18  Brame Dep. at 148:25-149:4, 163:18-164:7.)  Each officer is
    liable, however, where his acts amount to "integral
19  participation" in the constitutional violation.  See, e.g., James
    by James v. Sadler, 909 F.2d 834, 837 (5th Cir. 1990) (holding
20  that while officers did not physically perform the pat-down of
    plaintiff, because they provided back-up by remaining armed on
21  the premises throughout the search, their activities rendered
    them integral participants).  A reasonable jury could find that
22  Brame was an integral participant in Plumb's punch of plaintiff
    because Brame was simultaneously grabbing at plaintiff in an
23  attempt to "use more of [his] strength to try to get--get control
    of [plaintiff]."  (Brame Dep. at 146:10-147:3.)  A reasonable
24  jury could also find that Plumb was an integral participant in
    the takedown.  Brame states, "We lowered [plaintiff] to the
25  ground . . . .  We had control of his upper body as far as
    grabbing that, and once I was able to keep his lower body from
26  moving with his upper body, we were able to take him down to the
27  ground."  (Brame Dep. at 149:9-15 (emphasis added).)

28
                                23

(Docket No. 57-4)), although photos taken of plaintiff at booking show substantial bruising on his legs and buttocks, (Helm Decl. Ex. 33).  Based on this equivocal evidence, the degree of force used on plaintiff is genuinely in dispute.

The officers used force in the course of arresting plaintiff for driving under the influence, and the severity of that crime, a misdemeanor, is generally low.  See Bowman v. Reilly, Civ. No. 2:09-1322, 2010 WL 831412, at *6 (E.D. Pa. Mar. 4, 2010) (concluding the severity of a DUI was low in an excessive force analysis); Walker v. City of Post Falls, Civ. No. 1:07-264, 2008 WL 4997056, at *8 (D. Idaho May 21, 2008) (noting under Graham the severity of a DUI and the threat arrestee posed were not overwhelming although ultimately concluding officers' use of force was reasonable where arrestee had not cooperated). Although driving under the influence poses a risk to public safety, that risk, at least in this situation, was not immediate.

In examining the second two Graham factors, the court notes a number of material facts in dispute, including whether plaintiff actively resisted arrest.  Plaintiff admits that when Officer Brame grabbed him to handcuff him, he struggled a bit, but he states he did so while saying, "I am going to cooperate with you.  I will go.  Just you cannot handcuff me."  (Orr Dep. at 67.)  When the officers continued to grab him, plaintiff also continued to struggle, repeating, "You can't do that.  You can't do that."  (Id. at 67:11-14.)  From plaintiff's version of the facts, a reasonable jury could conclude that plaintiff's conduct did not amount to resistance to arrest, instead concluding that plaintiff was avoiding complying with the officers' attempt to

1    handcuff him.

2          Even if plaintiff failed to immediately submit to the

3    handcuffs, a jury could find that that alone is insufficient to

4    justify the use of force.  "[A] statement that a suspect is

5    physically unable to comply with a request does not, by itself,

6    justify the use of force.  Instead, the police may use force only

7    when the intrusion on the individual's liberty interest is

8    outweighed by the governmental interests at stake." Winterrowd

9    v. Nelson, 480 F.3d 1181, 1185 (9th Cir. 2007).  In Winterrowd,

10   the Ninth Circuit concluded that even when plaintiff was

11   "adamant" that he was not required to hand over his registration

12   to the officers, a mistake of law, "that attitude would not

13   justify the deliberate infliction of pain."  Id.

14         Defendants tell a different story, stating plaintiff

15   was shouting and even used expletives to communicate to the

16   officers that he would not submit to handcuffs.  (See Plumb Dep.

17   at 29.)  Defendants assert that plaintiff was "physically

18   fighting" the officers when they attempted to handcuff him.  (See

19   Defs.' Mot. at 26; Brame Dep. at 140:1-3, 143:23.)  As these

20   disputes demonstrate, whether plaintiff was actively resisting

21   arrest is the kind of factual inquiry that almost always turns on

22   a jury's credibility determination.  See Santos, 287 F.3d at 853.

23         Whether there was an immediate threat to the officers'

24   safety is also disputed.  Plaintiff had been cooperative up to

25   the point at which the officers attempted to handcuff him, which

26   is undisputed, (see Brame Dep. at 137:3-12 (describing plaintiff

27   as a "model citizen" up until the handcuffing)).  The officers

28   stated that plaintiff clenched his fists like a boxer, (Brame

                                   25

1   Dep. at 140:1-3, 143:23), and Plumb stated that it "appeared to

2   [him] that [plaintiff] was going to strike either [him] or

3   Officer Brame," (Plumb Dep. at 31:24-32:4).  Plaintiff, however,

4   insists that he never assumed this menacing position with his

5   fists clenched.  (See Orr Dep. at 66:22-67:14.)  Additionally,

6   plaintiff was at the time a 76-year-old man with poor balance.[9]

7   Plaintiff is not of slight build--his weight at the time was

8   somewhere between 190 to 210 pounds, (see Pass Decl. Ex. M-1

9   (Docket No. 57-3); Helm Opp'n Decl. Ex 42 (Docket No. 66-8)--but

10  he was matched by two officers, each of whom weighed 200 pounds

11  or over, (see Brame Dep. at 34:19-21; Plumb Dep. at 11:21-23).  A

12  jury could reasonably infer that plaintiff might have come around

13  and agreed to the handcuffs had the officers spent more time

14  conversing with him.

15        On the other hand, a threat to the officers could be

16  inferred from several other facts.  This event took place on the

17  side of the highway, which arguably exposed the officers to a

18  risk of being hit by a car.  If the officers reasonably believed

19  plaintiff was under the influence of drugs, which is contested,

20  then a jury could also conclude it was reasonable for them to

21  believe plaintiff posed a greater threat to them than if he was

22  sober.  See Paramo v. City of Morgan Hill, Civ. No. 3:01-825,

23  2002 WL 1497521, at *4 (N.D. Cal. Jul. 9, 2002) ("It was

24  _____

25        [9]   Defendants point out that plaintiff used to box in
    Golden Gloves competitions, (see Defs.' Mot. at 13; Orr Dep. at
26  65:14-15), but there is no evidence in the record that this was a
    known fact on the day of the incident.  This fact is therefore
27  immaterial.  For this reason, defendants' request that the court
    take judicial notice that the Golden Gloves is the name given to
28  annual competitions for amateur boxing is moot.

1  reasonable for an uncooperative suspect in custody and under the

2  influence of alcohol could pose a threat to the safety of medical

3  personnel."). Altogether, a determination on whether plaintiff

4  reasonably posed a threat to the officers requires a jury to sift

5  through a number of disputed factual contentions and draw

6  inferences therefrom.  See Santos, 287 F.3d at 853.

7          Ultimately, although the government generally may have

8  a substantial interest in reducing DUI violations, see Killian v.

9  City of Monterey, Civ. No. 5:12-5418, 2013 WL 6577064, at *9

10 (N.D. Cal. Dec. 13, 2013), and ensuring officer safety during

11 investigations, a reasonable jury could find either way that both

12 of those interests did or did not compel the kind of force used

13 here.  Because plaintiff's behavior leading up to the use of

14 force, and thus the risk to the officer's safety, is in dispute,

15 summary judgment is appropriate for neither party at this time.

16                  b. Qualified Immunity

17          Assuming Brame and Plumb's conduct constituted

18 excessive force in violation of the Fourth Amendment, the

19 officers cannot be held liable unless at the time of the arrest

20 it was clearly established that their use of force was

21 unreasonable.

22          "The Supreme Court has made clear that 'officials can

23 still be on notice that their conduct violates established law

24 even in novel factual circumstances." Mattos v. Agarano, 661

25 F.3d 433, 442 (9th Cir. 2011) (quoting Hope v. Pelzer, 536 U.S.

26 730, 741 (2002)).  The Ninth Circuit has noted the importance of

27 that principle "in the context of Fourth Amendment cases, where

28 the constitutional standard--reasonableness--is always a very

1   fact-specific inquiry." Id.  On the other hand, courts must

2   "apply the 'clearly established' rule in such a way that

3   faithfully guards 'the need to protect officials who are required

4   to exercise their discretion and the related public interest in

5   encouraging the vigorous exercise of official authority.'" Id.

6   (quoting Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982)).

7        In Winterrowd, police pulled over the plaintiff

8   suspecting that his license plates were invalid. See Winterrowd,

9   480 F.3d 1182.  When plaintiff did not produce a valid

10  registration, police ordered him to get out of the car and put

11  his hands behind his back. Id.  The plaintiff explained to the

12  officers that he could not put his hands behind his back because

13  he had a shoulder injury. Id.  The officers responded by forcing

14  plaintiff onto the hood of the car, grabbing plaintiff's right

15  arm, and forcing it up, until the plaintiff screamed in pain.

16  Id.  The Ninth Circuit held that absent a threat to officer

17  safety, officers are not entitled to use force just because an

18  arrestee refuses to comply with an officer's request.  Similar to

19  the facts here, there was a dispute over whether the plaintiff

20  was threatening.  The officers stated the plaintiff was

21  "belligerent" but the plaintiff stated he was neither threatening

22  nor physically abusive. Id. at 1184.

23       Viewing the facts in the light most favorable to

24  plaintiff, in Winterrowd the Ninth Circuit held that no

25  reasonable officer would believe he could constitutionally force

26  a harmless motorist against the hood of a car and cause him

27  unnecessary pain. Id. at 1186.  The court found that even where

28  the plaintiff was "verbally abusive" to the officers, "[a]n

1    officer may not use force solely because a suspect tells him he

2    is incapable of complying with a request during the course of an

3    ordinary pat-down." Id.

4        According to plaintiff, he calmly stated to the

5    officers he could not wear handcuffs because of his balance.

6    (See Orr Dep. at 63:3-4.)  Based on plaintiff's version of the

7    facts, which are disputed, the only factual difference between

8    Winterrowd and the instant case is that here plaintiff's

9    underlying alleged crime, a D.U.I., was arguably more severe than

10   driving with an invalid license.  While not a case on all fours,

11   Winterrowd sufficiently placed Brame and Plumb on notice that

12   their actions constituted unreasonable force.  Because there

13   remains a genuine dispute of material fact as to whether

14   plaintiff behaved in a non-threatening manner in informing the

15   officers that he could not comply with their instructions that he

16   needed to be handcuffed, the court may not grant qualified

17   immunity to the officers at this stage.

18       C. State law claims

19           a. California Civil Code Section 52.1

20       Section 52.1, the "Bane Act," permits "any individual

21   whose exercise or enjoyment of rights secured by the Constitution

22   or laws of the United States . . . has been interfered with, or

23   attempted to be interfered with, as described in subsection (a) .

24   . . may institute . . . a civil action for damages . . . ."  Cal.

25   Civ. Code § 52.1(b).  Subsection (a) permits the Attorney General

26   to bring a civil action when "a person . . . whether or not

27   acting under the color of law, interferes by threat,

28   intimidation, or coercion, or attempts to interfere by threat,

29

1  intimidation, or coercion" with a right secured by federal or

2  state law.  Id. § 52.1(a).  Section 52.1 was originally adopted

3  in response to a rise in hate crimes, but it is not limited to

4  such crimes, nor does it require plaintiffs to demonstrate

5  discriminatory intent.  Venegas v. County of Los Angeles, 32 Cal.

6  4th 820, 843 (2004) (holding that "plaintiffs need not allege

7  that defendants acted with discriminatory animus or intent, so

8  long as those acts were accompanied by the requisite threats,

9  intimidation, or coercion.").

10      Generally, establishing an excessive force claim under

11  the Fourth Amendment also satisfies the elements of section 52.1.

12  See Chaudhry v. City of Los Angeles, 751 F.3d 1096, 1105 (9th

13  Cir. 2014) ("The City defendants concede in their briefs to us

14  that a successful claim for excessive force under the Fourth

15  Amendment provides the basis for a successful claim under Section

16  52.1."); Cameron v. Craig, 713 F.3d 1012, 1022 (9th Cir. 2013)

17  ("Cameron asserts no California right different from the rights

18  guaranteed under the Fourth Amendment, so the elements of the

19  excessive force claim under Section 52.1 are the same as under §

20  1983."); Bender v. County of Los Angeles, 217 Cal. App. 4th 968,

21  978 (2d Dist. 2013) (holding that where an arrest is unlawful and

22  excessive force is applied in making the arrest, there has been

23  coercion in violation of the Bane Act); cf. Venegas, 32 Cal. 4th

24  at 843 ("We need not decide here whether section 52.1 affords

25  protections to every tort claimant, for plaintiffs in this case

26  have alleged unconstitutional search and seizure violations

27  extending far beyond ordinary tort claims.").  Accordingly,

28  because granting summary judgment to either party is

1    inappropriate with respect to plaintiff's unlawful arrest and

2    excessive force claims, so too will the court deny those motions

3    with respect to plaintiff's section 52.1 claim.

4          Defendants contend that even if the officers used

5    excessive force in violation of the Fourth Amendment, they are

6    immune from a Bane Act claim because their use of force was

7    privileged pursuant to California Penal Code sections 835 and

8    835a.  Section 835 provides that "[t]he person arrested may be

9    subjected to such restraint as is reasonable for his arrest and

10   detention."  Cal. Pen. Code § 835.  Section 835a provides that an

11   officer may use reasonable force to effect an arrest, to prevent

12   escape, or to overcome resistance.  Id. § 835a.  The court has

13   already determined that genuine issues of material fact remain as

14   to the reasonableness of force used by the officers.  Therefore,

15   at this stage the officers are not entitled to immunity under

16   sections 835 and 835a.

17               b. Assault, Battery, False Arrest, and Negligence

18                  Claims

19         For his assault and battery claims under California

20   law, plaintiff must prove that the force used by the police

21   officers was unreasonable.  See Bowoto v. Chevron Corp., 621 F.3d

22   1116, 1129 (9th Cir. 2010) ("Under California law, a plaintiff

23   bringing a battery claim against a law enforcement official has

24   the burden of proving the officer used unreasonable force.").

25   The court finds no difference between this reasonable analysis

26   and that which it previously performed in the Fourth Amendment

27   context.  See Hayes v. County of San Diego, 57 Cal. 4th 622, 632

28   (2013) (holding reasonableness must be determined under the

totality of the circumstances and quoting the § 1983 case Graham, 490 U.S. at 396, for the proposition that the use of force must be judged from the perspective of a reasonable officer at the scene).

Similarly, plaintiff's false arrest[10] and negligence claims[11] turn on the reasonableness of the officers' decision to arrest plaintiff for driving under the influence.  Because genuine issues of material fact remain as to the reasonableness of the arrest, the court will deny both parties' motions for summary judgment with respect to plaintiff's state-law claims for assault, battery, false arrest, and negligence.

---

[10]  "In California, false arrest is a species of the tort of false imprisonment." Blankenhorn v. City of Orange, 485 F.3d 463, 486 n.15 (9th Cir. 2007).  It is the "nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short." Id. (internal quotation marks and citations omitted).  An officer is not liable for false arrest where he "had reasonable cause to believe the arrest was lawful." Id. at 469 (quoting Cal. Pen. Code § 847(b)).  As discussed, there is a genuine dispute as to whether Officers Plumb and Brame had reasonable cause to believe arresting plaintiff for a DUI was supported by probable cause.

[11]  For his negligence claim, plaintiff must show the officers used unreasonable force under the circumstances. See Atkinson v. County of Tulare, 790 F. Supp. 2d 1188, 1211 (E.D. Cal. 2011) (Wanger, J.) ("Plaintiff's claim for negligence and battery flow from the same facts as the alleged Fourth Amendment Violation for excessive force and are measured by the same reasonableness standard of the Fourth Amendment.") (citing Edson v. City of Anaheim, 63 Cal. App. 4th 1269, 1272-73 (4th Dist. 1998)); Munoz v. City of Union City, 120 Cal. App. 4th 1077, 1102 n.6 (1st Dist. 2004), disapproved of on other grounds by Hayes v. County of San Diego, 57 Cal. 4th 622, 627-28 (2013); Carter v. City of Carlsbad, 799 F. Supp. 2d 1147, 1164 (S.D. Cal. 2011) ("Negligence claims stemming from allegations of excessive force by a police officer are also analyzed under the Fourth Amendment's reasonableness standard.").

32

1                   c. Elder Abuse

2           The Elder and Dependent Adult Civil Protection Act

3      ("EDACPA") proscribes "[p]hysical abuse, neglect, financial

4      abuse, abandonment, isolation, abduction, or other treatment with

5      resulting physical harm or pain or mental suffering" of an

6      individual over the age of 65.  Cal. Welf. & Inst. Code §§

7      15610.07, 15610.27.  The California legislature's express intent

8      in enacting the EDACPA was to protect elders and dependent adults

9      from abuse, because it recognized that the vulnerability of that

10     segment of the population places it at great risk of abuse by

11     families and caretakers.  See id. § 15600.

12          Neither the Ninth Circuit nor the California courts

13     have ruled on the issue of whether the EDACPA applies to law

14     enforcement taking custody of individuals over the age of 65.

15     Courts in this district have held that EDACPA does not apply to

16     law enforcement's conduct toward an arrestee, reasoning that

17     EDACPA was intended for deliberate, consistent caretakers, not

18     for limited encounters with law enforcement.  See Berman v. Sink,

19     Civ. No. 2:13-597 LJO SAB, 2013 WL 2360899, at *17 (E.D. Cal. May

20     29, 2013) ("This Court is unconvinced that an elderly person's

21     contact with law enforcement equates to actionable abuse under

22     the Elder Abuse Act given the [Act's] emphasis to remedy wrongs

23     by 'deliberate consistent caretakers.'"); Pirritano v. City of

24     Redding, Civ. No. 2:08-1488 MCE KJM, 2010 WL 716235, at *4 (E.D.

25     Cal. Mar. 1, 2010).  The court finds this reasoning persuasive,

26     particularly because law enforcement personnel are not among the

27     "care custodians" listed in the Act.  See id. § 15610.17.  The

28     court will therefore grant defendants' motion for summary

                                    33

1    judgment on this claim.

2        D. ADA/Rehabilitation Act against defendants CHP and State

3           of California

4            Plaintiff brings claims under Title II of the American

5    with Disabilities Act ("ADA") and the Rehabilitation Act ("RA")

6    against the California Highway Patrol and the State of

7    California.  (See FAC ¶¶ 63-74.)  Both Title II of the ADA and

8    the RA proscribe discrimination on the basis of disability by

9    state or local governments or their instrumentalities, although

10   the RA applies specifically to programs receiving federal

11   funding.[12]  See 42 U.S.C. § 12131(1)(B); 29 U.S.C. § 794(b).

12   Public entities are vicariously liable for the acts of their

13   employees under both acts.  See Duvall v. County of Kitsap, 260

14   F.3d 1124, 1141 (9th Cir. 2001).  "There is no significant

15   difference in analysis of the rights and obligations created by

16   the ADA and the Rehabilitation Act."  Zukle v. Regents of Univ.

17   of Cal., 166 F.3d 1041, 1045 n.11 (9th Cir. 1999).  Therefore,

18   the court will apply the same analysis to claims under both

19   statutes.

20            Under Title II of the ADA, "no qualified individual

21   with a disability shall, by reason of such disability, be

22   excluded from participation in or be denied the benefits of the

23   services, programs, or activities of a public entity, or be

24   _____

25       [12]  Eleventh Amendment immunity does not apply to claims
     under Title II of the ADA or the RA.  See Phiffer v. Columbia
26   River Corr. Inst., 384 F.3d 791, 792 (9th Cir. 2004) (citing Dare
     v. California, 191 F.3d 1167 (holding Congress abrogated states'
27   immunity under Title II of the ADA)); Clark v. State of Cal., 123
     F.3d 1267, 1271 (1997) (holding that by accepting federal funds a
28   state waives immunity under the RA).

1    subjected to discrimination by any such entity."  42 U.S.C. §

2    12132.  "Discrimination includes a failure to reasonably

3    accommodate a person's disability."  Sheehan v. City & County of

4    San Francisco, 743 F.3d 1211 (9th Cir. 2014).

5           Recently, the Ninth Circuit held that the ADA applies

6    to arrests, siding with the majority of circuits.  See id. at

7    1232.  The Supreme Court granted the Sheehan defendants' petition

8    of certiorari and will hear the case in March of this year.  See

9    City and County of San Francisco v. Sheehan, ___U.S.___,___, 135

10   S. Ct. 702 (2014).  However, the Ninth Circuit's opinion is still

11   binding on this court.  See Sanders County Republican Cent. Comm.

12   v. Fox (recognizing a published Ninth Circuit decision

13   constitutes binding authority which must be followed until it is

14   overruled by a body that is competent to do so (citing Gonzalez

15   v. Ariz., 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc))); see

16   also Wicker v. McCotter, 798 F.2d 155, 158 (5th Cir. 1986)

17   (holding that the fact that the Supreme Court grants certiorari

18   does not alter authority of the circuit's prior decisions).

19          The Ninth Circuit identified at least two types of

20   Title II claims applicable to arrests:

21

22    (1) wrongful arrest, where police wrongly arrest
      someone with a disability because they misperceive the
23    effects of that disability as criminal activity; and
      (2) reasonable accommodation, where, although police
24    properly investigate and arrest a person with a
      disability for a crime unrelated to that disability,
25    they fail to reasonably accommodate the person's
      disability in the course of investigation or arrest,
26    causing the person to suffer greater injury or
      indignity in that process than other arrestees.
27

28
                                 35

1  Sheehan, 743 F.3d at 1232.  Plaintiff proceeds under both

2  theories.

3             1. Wrongful Arrest

4        To prevail on his wrongful arrest theory under the ADA,

5  plaintiff must prove that (1) he was disabled; (2) the officers

6  knew or should have known he was disabled; and (3) the officers

7  arrested him because of legal conduct relating to his disability.

8  See Holocomb v. Ramar, Civ. No. 1:13-1102 AWI SKO, 2013 WL

9  5947621, at *6 (E.D. Cal. Nov. 4, 2013) (citing Gohier v.

10 Enright, 186 F.3d 1216, 1220 (10th Cir. 1999)); Lewis v. Truitt,

11 960 F. Supp. 175, 178 (S.D. Ind. 1997).  Defendants do not

12 dispute that plaintiff is disabled.  (See Defs.' Mot. at 41-42.)

13 The court's analysis will therefore focus on the second two

14 elements.

15       In its § 1983 analysis, the court already found there

16 is a genuine dispute of material fact concerning whether Officers

17 Brame and Plumb should have known plaintiff has disabilities

18 based on plaintiff's statements regarding his stroke, his

19 physical symptoms, including lack of balance, and his disabled

20 license plate.  Brame also saw plaintiff's cane in the back of

21 plaintiff's car. (See id. at 180:3-9.)  Although he made that

22 discovery after plaintiff was handcuffed, this was still before

23 plaintiff was taken to the CHP office.  A reasonable jury could

24 find these were sufficient clues for providing defendants with

25 notice that plaintiff had a disability.

26       Defendants argue that because the officers observed

27 plaintiff driving dangerously and erratically, then their arrest

28 of plaintiff was due to illegal conduct, and not legal conduct

related to his disability.  (Defs.' Mot. at 41-42.)  However, a reasonable jury could conclude that defendants arrested plaintiff and continued to detain him at the highway patrol office not for driving erratically, but for driving under the influence.  (See Brame Dep. at 118:23-119:1.)  The officers stated that several of plaintiff's stroke-related disabilities played into their decision to arrest plaintiff for a D.U.I.--his lack of balance, slurred speech, constricted pupils, and his difficulty following Brame's finger.  (See id. at 109:14-110:3.)  None of these physical characteristics constitute illegal conduct.  It can therefore reasonably be concluded that defendants arrested plaintiff because of legal conduct related to his disability.  See Jackson v. Inhabitants of Town of Sanford, Civ. No. 94-12, 1994 WL 589617, at *6 (D. Me. Sept. 23, 1994) (denying defendants' motion for summary judgment on plaintiff's claim that he was unjustifiably arrested for driving under the influence due to stroke-related disabilities in violation of the ADA, reasoning that the "legislative history of the ADA demonstrates that Congress was concerned with unjustified arrests of disabled persons such as the plaintiff there").  Because it also remains disputed whether the officers reasonably should have known that plaintiff is disabled, summary judgment is appropriate for neither party on plaintiff's wrongful arrest claim at this time.

　　　　　2. Reasonable Accommodation Theory

　　　　　Title II also subjects the officers to liability if they "fail[ed] to reasonably accommodate the [plaintiff's] disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than

1    other arrestees." Sheehan, 743 F.3d at 1232. "[The] plaintiff

2    bears the initial burden of producing evidence of the existence

3    of a reasonable accommodation," and "[a] public entity may defeat

4    a reasonable accommodation claim by showing 'that making the

5    modifications would fundamentally alter the nature of the

6    service, program, or activity.'" Id. at 1233. Plaintiff asserts

7    defendants denied him the accommodation of permitting him to (1)

8    remain unhandcuffed and (2) use his cane over the course of his

9    arrest. (Pl.'s Mot. at 38-40.)

10         "[A] public entity is on notice that an individual

11   needs an accommodation when it knows that an individual requires

12   one, either because that need is obvious or because the

13   individual requests an accommodation." Robertson v. Las Animas

14   County Sheriff's Dep't, 500 F.3d 1185, 1198 (10th Cir. 2007).

15   The parties dispute whether the officers were on notice that

16   plaintiff required an accommodation. Plaintiff states he

17   informed Brame that the reason he could not be handcuffed was

18   because he "ha[d] no balance." (Id. at 63:4-5.) Brame admits

19   plaintiff asked for his cane as they were leaving to head to the

20   CHP office, (Brame Dep. at 180:16-18), but plaintiff testified

21   that Brame did not return the cane to plaintiff until much later,

22   after they left the CHP office to book plaintiff at the jail,

23   (Orr Dep. at 91:11-20). Brame, however, testified that plaintiff

24   never mentioned that he could not balance without handcuffs and

25   instead stated that he did not want to be seen putting on

26   handcuffs by his neighbors and friends driving down the freeway.

27   (See Brame Dep. at 130.) Whether the officers were on notice

28   that plaintiff required an accommodation is thus in dispute.

Assuming defendants were on notice of plaintiff's need for an accommodation, the question becomes whether a jury could find that permitting plaintiff to stay out of handcuffs is reasonable.  "[T]the question of what constitutes a reasonable accommodation under the ADA requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to meet the program's standards."  <u>McGary v. City of Portland</u>, 386 F.3d 1259, 1270 (9th Cir. 2004) (internal quotation marks and citation omitted).

Defendants argue that it is unreasonable to ask a law enforcement officer to place himself in danger by permitting an arrestee to be unrestrained during an arrest. (Defs.' Mot. at 48-49.)  Because plaintiff was suspected of narcotic use and was physically combative, defendants argue it was especially unreasonable to expect the officers to permit plaintiff to travel with the officers without handcuffs. (<u>Id.</u>)  From defendants' characterizations of plaintiff's threatening behavior, a reasonable jury could conclude that it would be unreasonable for the officers to permit plaintiff to not wear handcuffs while he was in custody.

Other evidence suggests it would have been reasonable for the officers to permit plaintiff not to be restrained by handcuffs and use his cane.  If what plaintiff states is true, and he requested that he not be handcuffed <u>prior to</u> becoming combative, (see Orr Dep. at 63:4-5), then a reasonable jury could conclude that his request may have been more reasonable.  Furthermore, there is evidence that Officer Kelly later took off

1   plaintiff's handcuffs without trouble.  (Kelly Dep. at 16:9-14

2   (Docket No. 54-4).)  When they arrived at the CHP office, Kelly

3   took plaintiff's handcuffs off because plaintiff was having

4   problems walking up the stairs.  (Id.)  She assisted plaintiff by

5   holding onto his arm and during this time did not perceive

6   plaintiff as a threat.  (Id. at 17:13-23.)  Kelly testified that

7   she felt it was within her discretion to remove the handcuffs in

8   this situation even though plaintiff was in custody.  (Id. at

9   19:3-7.)  From these disputed facts--including whether or not

10  plaintiff was combative with the officers--the court cannot

11  conclude that a reasonable jury could not find one way or the

12  other that permitting plaintiff to proceed in custody

13  unhandcuffed with the use of his cane was reasonable.

14          Whether plaintiff suffered injury or indignity from the

15  officers' alleged failure to accommodate is also in dispute.

16  Plaintiff testified, "I can walk without a cane, but a cane is my

17  best friend," and "without the cane, I stagger.  With the cane, I

18  don't stagger as much, but I still stagger a little."  (Orr Dep.

19  at 26:23-24, 27:12-14.)  Plaintiff also testified that while

20  handcuffs would not impair his ability to walk, he would be

21  unable to get into the patrol car without use of his hands.  (Id.

22  at 64:6-13.)  Although there is no evidence of how plaintiff

23  fared entering and exiting the police car, a genuine dispute of

24  fact remains as to whether plaintiff suffered "greater injury or

25  indignity than other arrestees" while in handcuffs without the

26  use of his cane.  See Sheehan, 743 F.3d at 1232.

27          With so many facts in dispute, from which a reasonable

28  jury could or could not conclude that CHP and the State of

1  California violated Title II by not offering plaintiff a

2  reasonable accommodation, summary judgment is inappropriate on

3  plaintiff's reasonable accommodation claim.

4      It is THEREFORE ORDERED that defendants' motion for

5  summary judgment be, and the same hereby is, GRANTED with respect

6  to plaintiff's Section 51.7 and Elder Abuse claims and DENIED

7  with respect to all other claims.

8      It is FURTHER ORDERED that plaintiff's motion for

9  summary judgment be, and the same hereby is, DENIED in all

10  respects.

11  Dated:   February 25, 2015

12

WILLIAM B. SHUBB

13  UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

41