UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| HARRISON ORR, individually,<br><br>          Plaintiff,<br><br>v.<br><br>CALIFORNIA HIGHWAY PATROL, a public entity; STATE OF CALIFORNIA, a public entity; CALIFORNIA HIGHWAY PATROL OFFICERS BRAME, PLUMB, and DOES 1-10 individually,<br><br>          Defendants. | CIV. NO. 2:14-585 WBS EFB<br><br>MEMORANDUM AND ORDER RE:<br>ATTORNEY'S FEES AND COSTS |

----oo0oo----

        Plaintiff Harrison Orr brought this civil rights action against defendants California Highway Patrol ("CHP"), Officer Jay Brame, and Officer Terrence Plumb, arising out of plaintiff's arrest on August 3, 2013.  Plaintiff alleged the officers unlawfully arrested him and used excessive force against him in violation of state and federal law.  After a 10-day trial, the jury found for plaintiff only on certain claims against Plumb and

1

1  awarded plaintiff $125,000.  Plaintiff now seeks attorney's fees

2  and expenses under 42 U.S.C. § 1988 and California Civil Code §

3  52.1(h).

4  I.   Factual Background

5       As shown by the evidence at trial, Brame pulled

6  plaintiff over on the morning of August 3, 2013 because he

7  suspected him of driving under the influence of drugs or alcohol.

8  At the time, plaintiff was a 76-year-old man with slurred speech

9  and difficulties balancing as a result of a brain stem stroke he

10  suffered in 2006.  Plaintiff's disabilities caused him to fail

11  several sobriety tests.  As a further measure, Plumb arrived at

12  the scene with a breathalyzer testing device.  Plaintiff blew a

13  0.0, indicating he had not been drinking.  Plaintiff testified

14  that he repeatedly told the officers he had suffered from a

15  stroke that affected his balance, while the officers insisted at

16  trial that plaintiff used the word "neurological condition."  The

17  officers believed plaintiff was under the influence of drugs and

18  arrested him.

19       Although plaintiff was initially cooperative, he

20  refused to be handcuffed.  In an attempt to handcuff plaintiff,

21  the officers grabbed him from either side, Plumb punched

22  plaintiff in his stomach, and the officers took plaintiff to the

23  ground.  Brame then transported plaintiff to the CHP office,

24  where it was determined he was not under the influence of drugs.

25  Plaintiff was then booked for resisting arrest in violation of

26  California Penal Code section 148 and remained in custody at the

27  county jail until approximate 1:00 a.m.

28       The jury did not find Brame or the CHP liable on any of

2

1   plaintiff's claims.  It returned a verdict against Plumb on the

2   following claims: (1) unlawful arrest for the offense of

3   resisting arrest in violation of 42 U.S.C. § 1983 and California

4   state law; (2) use of excessive force in violation of 42 U.S.C. §

5   1983 and California state law; and (3) interference with civil

6   rights in violation of the Tom Bane Civil Rights Act, Cal. Civ.

7   Code § 52.1.  The jury awarded plaintiff $125,000 in compensatory

8   damages, but found that Plumb's conduct did not merit an award of

9   punitive damages.

10  II.  Attorney's Fees

11          Section 1988 permits the court, in its discretion, to

12  award reasonable attorney's fees to a prevailing party in an

13  action under 42 U.S.C. § 1983.  See 42 U.S.C. § 1988(b).  A

14  "prevailing party" is one who succeeds on any significant issue

15  in the litigation, resulting in a "material alteration of the

16  legal relationship of the parties."  Tex. State Teacher's Ass'n

17  v. Garland Indep. Sch. Dist., 489 U.S. 782, 792-93 (1989).  The

18  Bane Act also provides for an award of reasonable attorney's fees

19  to a prevailing plaintiff.  See Cal. Civ. Code § 52.1(h).  While

20  Plumb does not dispute that plaintiff is the prevailing party or

21  that he is entitled to attorney's fees under § 1988 and

22  subsection 52.1(h), he disputes the size of the fee award

23  plaintiff requests.

24          Courts typically determine the amount of a fee award

25  under § 1988 in two stages.  First, courts apply the "'lodestar'

26  method to determine what constitutes a reasonable attorney's

27  fee."  Gonzalez v. City of Maywood, 729 F.3d 1196, 1202 (9th Cir.

28  2013) (citations omitted).  The Ninth Circuit "'presum[es]' that

1  the district court accounts for the following factors in the

2  lodestar computation: '(1) the novelty and complexity of the

3  issues, (2) the special skill and experience of counsel, (3) the

4  quality of representation, (4) the results obtained, and (5) the

5  contingent nature of the fee agreement.'"  Id. at 1209 n.11

6  (quoting Morales v. City of San Rafael, 96 F.3d 359, 363 & n.9

7  (9th Cir. 1996)).

8          "After making that computation, the district

9  court then assesses whether it is necessary to adjust the

10  presumptively reasonable lodestar figure on the basis of the Kerr

11  factors that are not already subsumed in the initial lodestar

12  calculation."  Morales, 96 F.3d at 363-64.[1]  The Ninth Circuit

13  has emphasized that a district court's application of the Kerr

14  factors should reflect the extent to which those factors "bear on

15  the reasonableness of a fee award."  Id. at 361.  "[I]f the

16  district court has 'taken [any of the Kerr factors] into account

17  in either the reasonable hours component or the reasonable rate

18  _____

19          [1]    Those factors include:

20          (1) the time and labor required, (2) the novelty and
        difficulty of the questions involved, (3) the skill
21      requisite to perform the legal service properly, (4)
        the preclusion of other employment by the attorney due
22      to acceptance of the case, (5) the customary fee, (6)
        whether the fee is fixed or contingent, (7) time
23      limitations   imposed   by   the   client   or   the
        circumstances, (8) the amount involved and the results
24      obtained, (9) the experience, reputation, and ability
        of the attorneys, (10) the "undesirability" of the
25      case, (11) the nature and length of the professional
        relationship with the client, and (12) awards in
26      similar cases.

27  Kerr v. Screen Guild Extras, Inc., 526 F.2d 67, 70 (9th Cir.

28  1975).

4

1    component of the lodestar calculation,' then it should not again
2    reduce the lodestar" based on those factors.  Gonzalez, 729 F.3d
3    at 1209 n.11 (quoting Morales, 96 F.3d at 363 & n.9).

4         In determining the size of an appropriate fee award,
5    the Supreme Court has emphasized that courts need not "achieve
6    auditing perfection" or "become green-eyeshade accountants."  Fox
7    v. Vice, 563 U.S. 826, ---, 131 S.Ct. 2205, 2217 (2011).  Rather,
8    because the "essential goal of shifting fees . . . is to do rough
9    justice," the court may "use estimates" or "take into account
10   [its] overall sense of a suit" to determine a reasonable
11   attorney's fee.  Id.

12        A.   Lodestar Calculation

13             1.   Reasonable Hourly Rate

14        "In addition to computing a reasonable number of hours,
15   the district court must determine a reasonable hourly rate to use
16   for attorneys and paralegals in computing the lodestar amount."
17   Gonzalez, 729 F.3d at 1205 (citation omitted).  A reasonable
18   hourly rate is not defined "by reference to the rates actually
19   charged by the prevailing party."  Chalmers v. City of Los
20   Angeles, 796 F.2d 1205, 1210 (9th Cir. 1986).  Rather, reasonable
21   fees must be calculated based on the prevailing market rates
22   charged by "attorneys in the relevant community engaged in
23   'equally complex Federal litigation.'"  Prison Legal News v.
24   Schwarzenegger, 608 F.3d 446, 455 (9th Cir. 2010) (quoting Blum
25   v. Stenson, 465 U.S. 886, 895 n.11 (1984)); see also Van Skike v.
26   Dir., Off. of Workers' Comp. Programs, 557 F.3d 1041, 1046 (9th
27   Cir. 2009) ("The Supreme Court has consistently held that
28   reasonable fees 'are to be calculated according to the prevailing

1  market rates in the relevant community.'" (quoting Blum, 465 U.S.
2  at 895)).

3          "Generally, when determining a reasonable hourly rate,
4  the relevant community is the forum in which the district court
5  sits." Prison Legal News, 608 F.3d at 454 (internal quotation
6  marks omitted).  It is appropriate to rely on rates outside the
7  local forum only where "local counsel was unavailable, either
8  because they are unwilling or unable to perform because they lack
9  the degree of experience, expertise, or specialization required
10  to handle properly the case." Barjon v. Dalton, 132 F.3d 496,
11  500 (9th Cir. 1997) (quoting Gates v. Deukmejian, 987 F.2d 1392,
12  1405 (9th Cir. 1992)).  Although plaintiff's counsel practice
13  primarily in the San Francisco Bay Area, they concede they are
14  entitled only to local, Sacramento rates.

15          Plaintiff's counsel seek hourly rates of $550 for
16  Haddad and Sherwin, $360 for Guertin, and $300 for Altomare and
17  Helm for attorney work and $150 for work done by paralegals or by
18  attorneys at a paralegal rate.  Plumb contends that reasonable
19  hourly rates in Sacramento would be $400 for Haddad and Sherwin,
20  $175 for Guertin, $150 for Helm and Altomare for attorney work,
21  and $75 for work done by paralegals or at a paralegal rate.

22          Haddad has over 23 years of experience as a civil
23  rights lawyer and has tried more than 20 cases, including 12
24  police misconduct cases.  (Haddad Decl. ¶¶ 3-16 (Docket No.
25  181).)  Sherwin has 19 years of experience as a civil rights
26  lawyer and has tried 14 cases.  (Sherwin Decl. ¶¶ 23-48 (Docket
27  No. 184).)  Both are highly regarded civil rights attorneys.
28  (See Merin Decl. ¶¶ 12-13 (Docket No. 186); Katz Decl. ¶ 19

1    (Docket No. 185); Burton Decl. ¶¶ 12-13 (Docket No. 188); Burris

2    Decl. ¶ 14 (Docket No. 181-6).)

3              This court found in 2014 that $400 per hour was the

4    prevailing market rate for attorney John Burris, who at the time

5    had "nearly thirty-five years of legal experience and [] a record

6    of high-profile representations in civil rights matters."

7    Deocampo v. Potts, No. Civ. 2:06-1283 WBS, 2014 WL 788429, at *9

8    (E.D. Cal. Feb. 25, 2014).  The year before that, judges in this

9    district similarly found that $400 was the market rate for

10   lawyers with similar expertise and experience.  See, e.g., Lehr

11   v. City of Sacramento, No. Civ. 2:07-01565 MCE GGH, 2013 WL

12   1326546, at *7 (E.D. Cal. Apr. 2, 2013) (awarding $400 per hour

13   to Mark Merin, a "highly qualified civil rights attorney with

14   over 40 years of relevant litigation experience"); Knox v.

15   Chiang, No. Civ. 2:05-02198 MCE CKD, 2013 WL 2434606, at *7 (E.D.

16   Cal. June 5, 2013) (finding that "the prevailing hourly rate for

17   experienced civil rights attorneys practicing in the Sacramento

18   area does not exceed $400," but awarding $450 per hour in light

19   of the complexity of the case and counsel's success in arguing

20   the case before the Supreme Court).[2]

---

21            [2]    In 2009, Judge Mendez found that a blended rate of $375
22   was the appropriate market rate for Haddad and Sherwin.  Beecham
     v. City of W. Sacramento, No. Civ. S:07-1115 JAM EFB, 2009 WL
23   3824793, at *4 (E.D. Cal. Nov. 16, 2009); cf. Jones v. County of
     Sacramento, Civ. No. 2:09-1025 DAD, 2011 WL 3584332, at *8 (E.D.
24   Cal. Aug. 12, 2011) (finding that an hourly rate of $350 for a
     civil rights attorney with thirty-five years of litigation
25   experience was "in line with those prevailing in the Sacramento
     market").
26            Starting with the rate of $375 per hour from Beecham,
27   plaintiff's counsel inflate the rate by 7% per year to arrive at
     their requested rates.  Although counsel presented evidence that
28   the mean rate of fees in Sacramento increased by 16% between 2010

1          Mark Merin, a Sacramento civil rights attorney with 45

2    years of experience, indicates that plaintiff's counsel's

3    requested rates are "well within the range of rates charged by

4    and awarded to similarly experienced and qualified attorneys in

5    the Sacramento area litigating hard-fought jury trials in federal

6    court." (Merin Decl. ¶¶ 5, 21.)  Merin's declaration does not,

7    however, indicate that the rates charged in the cases he is

8    comparing to this one are of similar complexity.  Although § 1983

9    cases can raise complex issues, this case raised fairly

10   straightforward excessive force and unlawful arrest claims.  The

11   court would have found it more helpful if Merin had indicated the

12   rate he would have requested in t`his case.  In 2013, Merin

13   requested an hourly rate of $550 in an arguably more complex

14   civil rights case challenging the city's "anti-camping"

15   _____

16   and 2012, (Pearl Decl. ¶ 12, Ex. F (Docket No. 183)), there is no
     evidence of such an increase in the succeeding years.  Plumb has
17   also put forth evidence showing that a civil rights attorney with
     comparable skill had not increased her $300 hourly rate from 2005
18   to 2011.  (Compare Pass Decl. Ex. B-2 ¶ 9, with Moreno v. City of
     Sacramento, 534 F.3d 1106, 1110 (9th Cir. 2008)).  Nor can a
19   general rate of increase for all Sacramento attorneys can be assumed
     to apply to every practice area.  The court is more persuaded by
20   the rates currently charged and awarded.
21          Plaintiff's counsel also rely on the "2013 Ty Metrix,"
     which surveyed 35 partners and 43 associates in Sacramento to
22   determine a market rate.  This metrix, which does not appear to
     evaluate the experience, expertise, and practice areas of each
23   lawyer is not helpful in determining the prevailing market rate
     in the community for this case.  Moreover, while the copy
24   plaintiff provided to the court is incomplete, it appears it may
     be similar or the same as the "CEB and Datacert | TyMetrix,"
25   which this court has previously rejected in another civil rights
     case because it "is specifically designed for lawyers who work
26   for 'corporate clients.'"  Johnson v. Wayside Prop., Inc., No.
     Civ. 2:13-1610 WBS AC, 2014 WL 6634324, at *7 (E.D. Cal. Nov. 21,
27   2014).

28

                                      8

1    ordinance, but the court found that $400 was the prevailing

2    market rate.  Lehr, 2013 WL 1326546, at *1, *5, *7.

3          Stewart Katz, a Sacramento civil rights attorney with

4    37 years of experience also submitted a declaration in favor of

5    plaintiff's motion.  (Katz Decl. ¶ 2.)  Based on Katz's civil

6    rights experience and the court's observations of him during a

7    recent trial, the courts finds that he is of comparable skill and

8    expertise as Haddad and Sherwin.  Katz did not, however, indicate

9    what rate he would have requested for this case or that he

10   believes Haddad and Sherwin's requested rates are consistent with

11   the prevailing market rates for similar cases tried in this

12   court.  In 2011, Katz requested and received an hourly rate of

13   $350 in a similarly complex excessive force case.  See Jones v.

14   City of Sacramento, Civ. No. S-09-1025 DAD, 2011 WL 3584332, at

15   *6 (E.D. Cal. Aug. 12, 2011).

16         The court is therefore not persuaded that the

17   prevailing hourly rate of $400 for attorneys with comparable

18   skill and experience litigating a case of this complexity in

19   Sacramento has changed from what it was in 2014.  See Deocampo,

20   2014 WL 788429, at *9.  That rate applied to the attorney in

21   Deocampo, who had 35 years of experience and thus more experience

22   than Haddad and Sherwin, who have 23 and 19 years of experience,

23   respectively.  Nor is this an exceptional case meriting a higher

24   fee as in Knox, which "presented novel and complex issues" that

25   plaintiff's counsel successfully litigated in the Supreme Court.

26   See 2013 WL 2434606, at *3, *8.  Accordingly, the court finds

27   that a reasonable hourly rate for Haddad and Sherwin is $400.

28         Guertin is a sixth-year associate; Altomare is a third-

9

1    year associate; and Helm is a second-year associate.  (Sherwin

2    Decl. ¶¶ 6-8.)   The market rate for associates with comparable

3    experience ranges "between $150 and $175 per hour."  Joe Hand

4    Promotions, Inc. v. Albright, No. Civ. 2:11-2260 WBS CMK, 2013 WL

5    4094403, at *3 (E.D. Cal. Aug. 13, 2013) (citations omitted); see

6    also, e.g., Deocampo, 2014 WL 788429, at *9 (finding that the

7    reasonable hourly rate for an associate with 7 years of

8    experience, including 3 years of experience in civil rights

9    litigation, was $175); Broad. Music Inc. v. Antigua Cantina &

10   Grill, LLC, Civ. No. 2:12-1196 KJM DAD, 2013 WL 2244641, at *1

11   (E.D. Cal. May 21, 2013) (awarding an hourly rate of $175 for an

12   associate with 6 years of experience in a "routine copyright

13   infringement case").  The court therefore finds that reasonable

14   hourly rates are $175 for Guertin and $150 for Altomare and Helm.

15            Finally, courts in this district have generally found

16   that $75 is an appropriate hourly rate for paralegals.  See,

17   e.g., Albright, 2013 WL 4094403, at *3 (awarding an hourly rate

18   of $75 for paralegals); Friedman v. Cal. State Emps. Ass'n, No.

19   Civ. 2:00-101 WBS DAD, 2010 WL 2880148, at *4 (E.D. Cal. July 21,

20   2010) (noting that "the paralegal rate favored in this district

21   is $75 per hour" (citations omitted)).  The court will therefore

22   apply an hourly rate of $75 for the time expended by plaintiff's

23   paralegals or attorney time billed at a paralegal rate.

24            2.   Hours Reasonably Expended

25            Under the lodestar method, "a district court must start

26   by determining how many hours were reasonably expended on the

27   litigation, and then multiply those hours by the prevailing local

28   rate for an attorney of the skill required to perform the

                                  10

1   litigation." <u>Moreno v. City of Sacramento</u>, 534 F.3d 1106, 1111

2   (9th Cir. 2008).  In determining an appropriate fee award, "the

3   district court should exclude hours 'that are excessive,

4   redundant, or otherwise unnecessary.'" <u>McCown v. City of

5   Fontana</u>, 565 F.3d 1097, 1102 (9th Cir. 2009) (quoting <u>Hensley v.

6   Eckerhart</u>, 461 U.S. 424, 434 (1983)).

7        That standard is qualified by the Ninth Circuit's

8   admonition that, as a general rule, "the court should defer to

9   the winning lawyer's professional judgment as to how much time he

10  was required to spend on the case." <u>Moreno</u>, 534 F.3d at 1112;

11  <u>see also</u> <u>E-Pass Techs., Inc. v. 3Com Corp.</u>, Civ. No. 00-2255 DLJ,

12  2007 WL 4170514, at *6 (N.D. Cal. Nov. 14, 2007) ("[T]he court

13  will not second-guess reasonable attorney conduct of a litigation

14  strategy for the case.").  This principle particularly applies to

15  plaintiffs' attorneys in civil rights cases because, as here,

16  such attorneys often work on a contingency basis and thus have

17  little incentive to expend unnecessary hours. <u>See, e.g.</u>, <u>Moreno</u>,

18  534 F.3d at 1112 ("It would be the highly unusual civil rights

19  case where [a] plaintiff's lawyer engages in churning.");

20  <u>Blackwell v. Foley</u>, 724 F. Supp. 2d 1068, 1080 (N.D. Cal. 2010)

21  ("[I]f anything, an attorney working on contingency is less

22  likely to expend unnecessary hours because the payoff is too

23  uncertain.").

24        Here, plaintiff's counsel submitted billing statements

25  reflecting a total of 1,539 hours, which is broken down to 493

26  hours by Haddad, 301.7 hours by Sherwin, 284.5 hours by Guertin,

27  326.6 hours by Helm, 7.2 hours by Altomare, and 126 hours by

28  paralegals.  Plumb objects that the total hours requested is

1  unreasonable and the court will address each of his arguments in

2  turn.

3                                  a.   <u>Objections to Discrete Tasks</u>

4                                         1.   <u>Plaintiff's Motion for Summary Judgment</u>

5              Plaintiff filed a lengthy motion for summary judgment,

6  (Docket Nos. 50-54), which the court denied in its entirety after

7  finding numerous disputed issues of material fact, (Docket No.

8  79).  The court generally agrees with Plumb that plaintiff's

9  counsel could not have anticipated a strong probability of

10  success on that motion because of the numerous factual disputes

11  and reasonableness standard governing most of plaintiff's claims.

12  An experienced attorney could likely predict that plaintiff's

13  claims were not the types of claims a court can usually resolve

14  as a matter of law at summary judgment.  In Katz's declaration

15  that plaintiff submitted, Katz similarly noted that he "might not

16  have brought the plaintiff's motion for summary adjudication."

17  (Katz Decl. ¶ 14.)  Katz recognized, however, that the motion

18  "may have contributed to the overall result whether or not in

19  isolation [it] was a motion on which plaintiff was likely to

20  prevail."  (<u>Id.</u>)  Sherwin also explains that much of the work to

21  prepare plaintiff's motion for summary judgment would have been

22  necessary to oppose defendants' motion for summary judgment and

23  also "substituted for" trial preparation work.  (Supp. Sherwin

24  Decl. ¶ 7 (Docket No. 200).)[3]

25          [3]   Plaintiff's counsel also explains that the summary

26  judgment motions "gave all parties insight into what issues the
Court deemed important at trial and what evidence it expected the

27  parties to produce on those issues."  (Pl.'s Reply at 11:27-12:2
(Docket No. 189).)  Suffice to say, it is not sufficient reason

28  to file a motion that lacks merit simply to gain insight from the

1    The court's denial of plaintiff's summary judgment

2 motion, in itself, does not preclude plaintiff from recovering

3 those fees if plaintiff was reasonable in filing the motion.[4]

4 Although the court questions whether the decision to seek summary

5 judgment was reasonable in light of the facts and claims in this

6 case, it generally agrees with counsel that much of the work

7 would have been done to oppose defendants' motion for summary

8 judgment and prepare for trial.  Of the 69.6 hours expended on

9 plaintiff's motion for summary judgment, Helm billed 40.2 hours.

10 In light of these considerations, the court will deduct 20 hours

11 from Helm's billings to account for work done exclusively to

12 advance the summary judgment motion.

13        2. <u>Mock Jury Trial</u>

14    Plaintiff's counsel expended a total of 31.9 hours for

15 the time of four attorneys and 8.8 hours of paralegal time to

16 present the case to a mock jury.  The Ninth Circuit has held that

17 "hours spent on a moot court trial run, and on consultations

18 regarding a jury project related to the case," may be "included

19 in a fee award as long as the number of hours spent was

20 reasonable."  <u>United Steelworkers of Am. v. Phelps Dodge Corp.</u>,

21 896 F.2d 403, 407 (9th Cir. 1990).  While the mock jury valued

22 _____

court.

23

   [4] The inquiry here is only whether it was reasonable for

24 plaintiff to expend time in pursuit of summary judgment.  The
court will address a reduction to the lodestar based on

25 plaintiff's limited success in the litigation after considering
all of Plumb's objections to the hours expended on discrete

26 tasks.  <u>See</u> <u>Morales</u>, 96 F.3d at 363-64 & n.9.  Moreover, a denial
of summary judgment merely means the case has to go to the jury

27 and is thus not the same type of "limited success" as a final

28 judgment in favor of a defendant.

            13

1  plaintiff's case significantly higher than the actual jury did,

2  the court does not find that the time counsel expended to perform

3  a mock trial was unreasonable and therefore will not deduct any

4  of that time.

5                          3.  Dr. Chan

6          Plumb next objects to the 8.8 hours of attorney time

7  expended in attempt to secure plaintiff's treating physician's

8  testimony at trial.  Sherwin has adequately explained why the

9  time expended was reasonable, (see Supp. Sherwin Decl. ¶ 9), and

10 the court will not reduce any of those hours.

11                 4.  Post-Verdict Jury Consultant and

12                      Settlement Strategizing

13         Plumb also objects to the 1.8 hours of attorney time

14 spent after trial to develop a settlement strategy.  Although

15 defendants may have remained unwilling to settle the case,

16 plaintiff's counsel were entirely reasonable in expending this

17 limited amount of time to assess their settlement position, which

18 could have avoided the expenditure of this court's resources to

19 decide this very motion and the resources of the appellate court

20 on the pending appeal.  The court will not reduce this time.

21                 5.  Associates' Presence at Hearings

22         Plumb next objects to the .9 hours Guertin billed and

23 4.9 hours Helm billed in connection with the pretrial conference

24 and the 15.9 hours Guertin billed to attend trial because those

25 associates did not appear or participate.  Sherwin explains that

26 they have "already redacted extensive time from each associate's

27 time records for the pretrial conference and trial," and she

28 adequately accounts for this billed time by the associates based

                                14

1  on the work they prepared in anticipation of the pretrial

2  conference and trial.  (See Supp. Sherwin Decl. ¶¶ 13, 16.)

3      Moreover, defendants staffed this case with multiple

4  attorneys and courts have recognized that staffing multiple

5  attorneys on a single task may improve a party's chance of

6  success in litigation.  See, e.g., PSM Holding Corp. v. Nat'l

7  Farm Fin. Corp., 743 F. Supp. 2d 1136, 1157 (C.D. Cal. 2010)

8  ("[D]ivision of responsibility may make it necessary for more

9  than one attorney to attend activities such as depositions and

10  hearings. Multiple attorneys may be essential for planning

11  strategy, eliciting testimony or evaluating facts or law."

12  (citation omitted)); cf. United States v. City & County of San

13  Francisco, 748 F. Supp. 1416, 1421 (N.D. Cal. 1990) (noting that

14  "the presence of several attorneys at strategy sessions for

15  complex civil rights class actions may be crucial to the case").

16  The court therefore will not deduct this time.

17              6.  Documents Not Filed with the Court

18      Plumb next objects to the time expended to prepare a

19  stipulated protective order (0.8 hours), a jury questionnaire

20  (3.5 hours), and a cost bill (4.8 hours) because these documents

21  were never filed with the court.  Sherwin has explained the

22  reasonableness of the limited time expended to prepare a form

23  protective order, which the parties ultimately did not use.  (See

24  Supp. Sherwin Decl. ¶ 17.)  She has also represented that all of

25  the time expended to prepare the cost bill was used in the

26  present motion for expenses.  (See id. ¶ 18.)  The court will

27  therefore not deduct this time.

28      The court will deduct the 3.5 hours Guertin spent to

1  prepare a jury questionnaire because it was unreasonable to

2  expend this time before inquiring whether the court would even

3  consider submitting a questionnaire to the jury and counsel has

4  not indicated that the questionnaire was useful during jury

5  selection for any other reason.

6                   7.  <u>Attendance at Depositions</u>

7           Lastly, Plumb requests that the court reduce the hours

8  billed by various attorneys by 75% for the time they expended

9  attending depositions without conducting or defending the

10  deposition and the depositions associates participated in when

11  their participation was not "critical."

12          Although the Ninth Circuit has instructed courts to

13  "examine with skepticism claims that several lawyers were needed

14  to perform a task," it has also emphasized that staffing multiple

15  lawyers on a single task is not by itself evidence of excessive

16  billing.  <u>Democratic Party of Wash. State v. Reed</u>, 388 F.3d 1281,

17  1286 (9th Cir. 2004); <u>see also</u> <u>Moreno</u>, 534 F.3d at 1113

18  (emphasizing that "[f]indings of duplicative work should not just

19  become a shortcut for reducing a fee award without identifying

20  just why the requested fee was excessive").

21          "[D]ivision of responsibility may make it necessary for

22  more than one attorney to attend activities such as depositions

23  and hearings.  Multiple attorneys may be essential for planning

24  strategy, eliciting testimony or evaluating facts or law."  <u>PSM</u>

25  <u>Holding Corp.</u>, 743 F. Supp. 2d at 1157.  Absent any specific

26  evidence that staffing multiple attorneys on particular tasks was

27  excessive, the court will not reduce the billed hours on that

28  basis alone.  <u>See</u> <u>Moreno</u>, 534 F.3d at 1114 (noting that the

16

1  "district court may not set the fee based on speculation as to

2  how other firms would have staffed the case").   Moreover, Sherwin

3  has described in detail the associate time that was redacted and

4  explained that a significant amount of time Helm expended was

5  billed at a paralegal rate.   (See Supp. Sherwin Decl. ¶¶ 13-15.)

6  The court therefore will not reduce this time.

7                    b.    Limited Success

8            The Supreme Court and Ninth Circuit have emphasized

9  that "the extent of a plaintiff's success is a crucial factor for

10 determining the proper amount of an award of attorney's fees

11 under 42 U.S.C. § 1988."   Hensley, 461 U.S. at 440; see also

12 McCown, 565 F.3d at 1103 (holding that attorney's fees "must be

13 adjusted downward where the plaintiff has obtained limited

14 success on his pleaded claims, and the result does not confer a

15 meaningful public benefit").

16           Plumb argues that the lodestar award should be reduced

17 by 50% to account for plaintiff's limited success at trial.

18 Plaintiff, on the other hand, argues that a 1.3 multiplier

19 enhancement is merited based on plaintiff's "excellent" results

20 and the risk counsel undertook in taking this case on a

21 contingency.

22           Plaintiff pursued numerous claims in this case: (1)

23 § 1983 excessive force claims against Brame and Plumb; (2) § 1983

24 unreasonable seizure claim against Brame and Plumb challenging

25 the arrests for driving under the influence of drugs and

26 resisting arrest; (3) Bane Act claim for interference with

27 plaintiff's enjoyment of his rights against Brame and Plumb; (4)

28 interference with plaintiff's right to be free from violence or

17

1  intimidation, Cal. Civ. Code § 51.7, against Brame and Plumb; (5)

2  battery by a police officer against Brame and Plumb; (6)

3  negligence against Brame and Plumb;[5] (7) Elder Abuse, Cal Welfare

4  & Insts. Code § 15610.07, against Brame and Plumb; (8) false

5  arrest against Brame and Plumb challenging the arrests for

6  driving under the influence of drugs and resisting arrest; (9)

7  violation of the American with Disabilities Act ("ADA") against

8  the CHP; and (10) violation of the Rehabilitation Act against the

9  CHP.  After the parties filed cross-motions for summary judgment,

10 the court entered judgment in favor of defendants on plaintiff's

11 section 51.7 and elder abuse claims and found that genuine

12 disputes of material fact necessitated a trial on the remaining

13 claims.  Cf. McCown, 565 F.3d at 1103 (holding that "the fact

14 that eight of [plaintiff's] nine claims were dismissed at summary

15 judgment 'figures into the calculation' of attorney's fees").

16          At trial, plaintiff prevailed only against Plumb on his

17 § 1983 claims for excessive force and false arrest for resisting

18 arrest, Bane Act claim, battery claim, and state law false arrest

19 claim for resisting arrest.  Brame and the CHP prevailed on all

20 claims against them.  In determining the reasonable fee, a

21 reduction to account for plaintiff's lack of success against two

22 of the three defendants and lack of success on plaintiff's § 1983

23 false arrest claim based on the arrest for driving under the

24 influence of drugs is appropriate.  See Webb v. Sloan, 330 F.3d

25 1158, 1169-70 (9th Cir. 2003) ("Plaintiff initially sued several

26 defendants, but prevailed against only one: Carson City.  A

27

28       [5]   Plaintiff abandoned his negligence claim before trial.

1    discretionary reduction to reflect that kind of limited success

2    is appropriate.").

3          The Supreme Court has identified "two questions [that]

4    must be addressed" when determining a reasonable fee in light of

5    a plaintiff's limited success.  Hensley, 461 F.3d at 434.  First,

6    the court must determine whether "the plaintiff fail[ed] to

7    prevail on claims that were unrelated to the claims on which he

8    succeeded[.]"  Id.  "[C]laims are unrelated if the successful and

9    unsuccessful claims are distinctly different both legally and

10   factually; claims are related, however, if they involve a common

11   core of facts or are based on related legal theories."  Dang v.

12   Cross, 422 F.3d 800, 813 (9th Cir. 2005) (citations omitted)

13   (alteration in original).  If the successful claims did not arise

14   out of the "same 'course of conduct,' . . . the hours expended on

15   the unsuccessful claims should not be included in the fee award."

16   Id. (citation omitted).

17         In McCown, officers allegedly used excessive force

18   during the course of an arrest and the plaintiff brought § 1983

19   claims against the officers challenging their use of force and

20   the arrest, as well as a Monell claim against the city.  565 F.3d

21   at 1101.  The Ninth Circuit affirmed the district court's finding

22   that the claims were all related because even though the claims

23   were based on "different legal theories against different

24   defendants," the claims all "arose from a common core of facts,

25   namely, [the plaintiff's] arrest."  Id. at 1103; see also Webb,

26   330 F.3d at 1169 (affirming the district court's finding that

27   claims pursuing "numerous legal theories against several

28   defendants" were related because "all his claims arose out of a

                                    19

1   common core of facts and a common course of conduct: Plaintiff's

2   arrest, detention, and prosecution").

3           Similar to McCown, all of plaintiff's claims arose out

4   of a single incident in which Brame and Plumb used force in the

5   process of arresting plaintiff.  Plaintiff's unsuccessful

6   Rehabilitation Act and ADA claims against the CHP were based on

7   that same incident.  Because plaintiff's claims arose out of a

8   "common core of facts," Dang, 422 F.3d at 813, the court may "not

9   attempt to divide the request for attorney's fees on a claim-by-

10  claim basis."  McCown, 565 F.3d at 1103.  "Instead, the court

11  must proceed to the second part of the analysis and focus on the

12  significance of the overall relief obtained by [plaintiff] in

13  relation to the hours reasonably expended on the litigation."

14  Id. (citation omitted).

15          When successful and unsuccessful claims are related,

16  "attorney's fees awarded under 42 U.S.C. § 1988 must be adjusted

17  downward where the plaintiff has obtained limited success on his

18  pleaded claims, and the result does not confer a meaningful

19  public benefit."  McCown, 565 F.3d at 1103.  In assessing the

20  reasonableness of the overall fee in light of a plaintiff's

21  limited success, the court "is obligated to give primary

22  consideration to the amount of damages awarded as compared to the

23  amount sought."  Farrar v. Hobby, 506 U.S. 103, 114 (1992)

24  (quoting Riverside v. Rivera, 477 U.S. 561, 585 (1986) (Powell,

25  J., concurring)).  "Although the Supreme Court has disavowed a

26  test of strict proportionality, it also suggested that a

27  comparison of damages awarded to damages sought is required."

28  McCown, 565 F.3d at 1104; see also Hensley, 461 U.S. at 435 n.11

1   (rejecting "a mathematical approach comparing the total number of

2   issues in the case with those actually prevailed upon").

3           During closing arguments in this case, plaintiff's

4   counsel presented a thorough and forceful argument as to the

5   damages they believed the jury should award plaintiff.  Counsel

6   began by addressing punitive damages and emphasized the purpose

7   of punitive damages and why they believed the jury should award

8   punitive damages against both officers.  After explaining why the

9   conduct at issue necessitated an award of punitive damages,

10  counsel recommended that the jury award "$250,000 in punitive

11  damages against each officer."  (Tr. Vol. 8 at 1471:1-2 (Docket

12  No. 175).)

13          Counsel then returned to compensatory damages and

14  reviewed the evidence in great detail as to the injuries

15  plaintiff suffered and how the incident severely affected his

16  life and caused him to endure "the most severe pain he has ever

17  had in his life."  (Id. at 1481:17-18; see generally id. at

18  1471:6-1485:11.)  Counsel then recommended that the jury award

19  plaintiff $750,000 in compensatory damages against Brame and

20  Plumb based on plaintiff's federal and state false arrest and

21  excessive force claims.  (See id. at 1484:11-17.)[6]  Counsel

22  _____

23          [6]    The transcript does not reflect the amount of
    compensatory damages counsel suggested the jury award against the
    individual officers because counsel wrote it on a sample verdict

24  form and said, "here is what we recommend as being respectful for
    the loss that Harry has suffered."  (Id. at 1484:15-16.)  Because

25  the court does not independently recall what counsel wrote on the
    sample verdict form, the court relied on Plumb's representation

26  that plaintiff asked for a total of $1.75 million in compensatory
    and punitive damages to arrive at the requested amount of

27  $750,000.00.  Plaintiff did not dispute this amount in his Reply
    brief.

28

1   further recommended that the jury award $500,000 against the CHP

2   based on plaintiff's Rehabilitation Act and ADA claims.  (Id. at

3   1485:10-11.)

4          At the close of their argument, counsel had asked the

5   jury to award plaintiff a total of $1.75 million against three

6   defendants.  There can be little debate that the jury rejected

7   this request.  In the end, the jury awarded only $125,000 in

8   compensatory damages against one defendant on certain claims.

9   This award is only slightly more than 7% of the damages plaintiff

10  sought.  The jury also entirely rejected plaintiff's claim that

11  the officers lacked probable cause to arrest him for driving

12  under the influence of drugs, which was a significant theory of

13  his case.

14         Courts in this district have imposed reductions

15  generally ranging from 35% to 75% when a plaintiff has recovered

16  significantly less in damages than originally sought and did not

17  recover any punitive damages.  See, e.g., Jones v. McGill, Civ.

18  No. 1:08-396 LJO DLB, 2009 WL 1862457, at *4-5 (E.D. Cal. June

19  29, 2009) (reducing attorney's fees in excessive force case over

20  75% when the plaintiff sought $15.2 million in damages against

21  eight defendants but recovered only $9,900 against one

22  defendant); Beecham, 2009 WL 3824793, at *5 (reducing fee award

23  by 50% when plaintiffs obtained only $33,400 in damages out of

24  the $1.8 million they sought).

25         In Deocampo, this court reduced the fee award by

26  only 25%.  2014 WL 788429, at *1.  In that case, however, the

27  plaintiff requested only $300,000 in compensatory damages and the

28  jury awarded $50,000 and found that two of the officers' conduct

1    was malicious, oppressive, or in reckless disregard of

2    plaintiff's rights.  Id. at *11.  Similarly, in Jones v. County

3    of Sacramento, the court reduced the fee award by only 25% when

4    the jury awarded $31,000 of the almost $1.5 million requested,

5    but found that the officers' conduct was malicious, oppressive or

6    in reckless disregard of plaintiff's rights and "the amount of

7    damages awarded to plaintiff . . . may well have had more to do

8    with the jury finding plaintiff to be an unsympathetic figure who

9    was significantly emotionally damaged prior to th[e] incident."

10   2011 WL 3584332, at *19.

11          Because the jury did not find that Plumb's conduct was

12   malicious, oppressive, or in reckless disregard of plaintiff's

13   rights, this case is distinguishable from the 25% reduction in

14   Deocampo and Jones.  In contrasting the $1.75 million in

15   compensatory and punitive damages plaintiff sought against three

16   defendants and the $125,000 in only compensatory damages the jury

17   awarded against one defendant, the court finds that a significant

18   reduction in fees is necessary to account for plaintiff's limited

19   success.

20          At the same time, "in determining a reasonable

21   fee award [], the district court should consider not only the

22   monetary results but also the significant nonmonetary results

23   [the plaintiff] achieved for himself and other members of

24   society."  McCown, 565 F.3d at 1105 (quoting Morales, 96 F.3d at

25   365).  The court must assess "whether, and to what extent, [the

26   plaintiff's] suit benefitted the public," including "whether the

27   plaintiff has affected a change in policy or a deterrent to

28   widespread civil rights violations."  Id. 1105.  "The public

                                    23

1   benefit of a suit must have enough of an impact to justify a

2   fully compensatory fee award despite limited success on damages

3   claims." Id.

4          For example, in Wilcox v. City of Reno, the Ninth

5   Circuit emphasized that the significant public benefit from the

6   plaintiff's case merited an award of fees even though the

7   plaintiff recovered only nominal damages.  42 F.3d 550, 556 (9th

8   Cir. 1994).  In that case, the "jury determined a city policy to

9   be unconstitutional, and further determined that the policy

10  caused injury to [plaintiff]." Id.  The Ninth Circuit described

11  these results as "admirable" and found that the "litigation

12  likely precipitated both the disciplining of [the defendant

13  officer] and the change in [the city's] policy." Id.  The court

14  concluded that the "judgment . . . will benefit the City and its

15  residents by preventing the police department from reverting to

16  its old policy or a similar policy some time in the future." Id.

17  at 556-57.

18         Here, on the other hand, plaintiff did not pursue a

19  Monell claim or prevail on his Rehabilitation Act and ADA claims

20  against the CHP and thereby did not achieve any change in CHP

21  policy.  Although counsel credits plaintiff's case as having

22  exposed the CHP's alleged "ticket quota," plaintiff's case never

23  challenged or sought to remedy any alleged quota.  Plaintiff's

24  limited verdict does not require the CHP to alter its conduct in

25  any way.

26         The jury also awarded plaintiff only compensatory

27  damages, which the court instructed are limited to "the amount of

28  money that will reasonably and fairly compensate the plaintiff

24

1   for any injury you find was caused by one or both individual

2   defendants." (Jury Instruction No. 15.)  The jury was instructed

3   and counsel emphatically argued that the purpose of punitive

4   damages was to deter future violations.  Counsel explained that

5   one reason "we're allowed to bring civil rights cases like this"

6   is to "punish people who violate our most cherished fundamental

7   constitutional rights, and to make an example of those people,

8   which deters other officers from engaging in similar misconduct

9   in the future." (Tr. Vol. 8 at 1467:18-25.)  In finding that

10  neither officer's conduct was malicious, oppressive, or in

11  reckless disregard of plaintiff's rights, the jury rejected

12  plaintiff's request for punitive damages and counsel's argument

13  that such an award was necessary to deter future violations.

14  Absent an award of punitive damages, the jury did not award any

15  amount of damages to deter future constitutional violations.

16        While a limited award of compensatory damages against

17  one officer cannot legally be said to deter future violations,

18  one would think that any award of compensatory damages against an

19  individual officer would deter future violations because officers

20  and their departments would want to avoid similar financial

21  losses in the future.  The Supreme Court and Ninth Circuit have

22  in fact recognized the deterrent value of successful § 1983

23  litigation.  See, e.g., City of Monterey v. Del Monte Dunes at

24  Monterey, Ltd., 526 U.S. 687, 727 (1999) (Scalia, J., concurring)

25  ("Section 1983 . . . [l]ike other tort causes of action, [] is

26  designed to provide compensation for injuries arising from the

27  violation of legal duties, and thereby, of course, to deter

28  future violations." (internal citation omitted)); Mendez v. City

25

1   of San Bernardino, 540 F.3d 1109, 1128 (9th Cir. 2008), overruled

2   by other grounds by, Arizona v. ASARCO LLC, 773 F.3d 1050 (9th

3   Cir. 2014) ("Successful suits act as a deterrent to law

4   enforcement and 'serve[ ] the public purpose of helping to

5   protect [the plaintiff] and persons like him from being subjected

6   to similar unlawful treatment in the future.'").

7           Empirical studies, however, are calling into question

8   whether successful § 1983 actions are actually deterring future

9   constitutional violations.  For example, Professor Joanna

10  Schwartz recently examined 44 of the "largest law enforcement

11  agencies across the country" and 37 "small and mid-sized

12  agencies" and found that "police officers are virtually always

13  indemnified," with the government agencies paying "approximately

14  99.98% of the dollars that plaintiffs recovered in lawsuits

15  alleging civil rights violations by law enforcement," including

16  awards of punitive damages and "even when indemnification was

17  prohibited by law or policy."  Joanna C. Schwartz, Police

18  Indemnification, 89 N.Y.U. L. Rev. 885, 885 (2014).  Professor

19  Schwartz concluded that while indemnification furthers § 1983's

20  goal of compensating injured plaintiffs, it frustrates § 1983's

21  goal of deterring future violations because indemnification

22  limits the impact of compensatory and punitive damages awards on

23  individual officers" and the "available evidence suggests that

24  the threat of being sued does not significantly influence officer

25  behavior."  Id. at 953.  Professor Schwartz further found that

26  "governments do not appear to be collecting enough information

27  about lawsuits to make educated decisions about whether or how to

28  reduce the police activities that prompt these suits."  Id. at

1  956.

2          These findings suggest that a court should not simply

3  assume that any award of compensatory damages against only an

4  individual officer will deter any future violations.  The court

5  must evaluate the circumstances of each particular case to assess

6  whether it seems possible that the verdict will truly deter

7  future violations.  Here, given the lack of change to any CHP

8  policy, the jury's rejection of punitive damages, the CHP's and

9  Brame's complete success, all defendants' success on the false

10  arrest claim based on driving under the influence, and the

11  relatively small compensatory award against one officer, the

12  court is not persuaded that the verdict in this case will

13  meaningfully deter future violations by other officers.  While

14  vindicating one individual's constitutional rights is incredibly

15  important and this case pursued significant legal rights, the

16  court does not find that plaintiff's limited success in this case

17  provides a tangible benefit to the public that renders the full

18  fee counsel seeks--or any enhancement to that fee--reasonable.

19                  c.   Risk of Contingency

20          "Unlike federal law, California law allows for a

21  multiplier of the lodestar to compensate for the risk of

22  contingent representation."  Chaudhry v. City of Los Angeles, 751

23  F.3d 1096, 1112 (9th Cir. 2014).  The Ninth Circuit has "held

24  that when a plaintiff succeeds on both federal and state claims

25  that support a fee award, the state-law multiplier is available."

26  Id.  Under California law, a contingency enhancement "is intended

27  to approximate market-level compensation for such services, which

28  typically includes a premium for the risk of nonpayment or delay

1    in payment of attorney fees." <u>Ketchum v. Moses</u>, 24 Cal. 4th

2    1122, 1138 (2001).  "[T]he trial court is not <u>required</u> to include

3    a fee enhancement to the basic lodestar figure for contingent

4    risk, exceptional skill, or other factors, although it retains

5    discretion to do so in the appropriate case."  <u>Id.</u>

6         Plaintiff's counsel took this case on contingency and

7    therefore bore a risk of not receiving payment and incurring

8    significant costs if defendants prevailed.  As Katz explained,

9    given plaintiff's age and medical conditions, counsel also faced

10   a risk that plaintiff might die before final judgment.  (Katz

11   Decl. ¶ 16.)

12        It is doubtful, however, that the risk counsel

13   perceived from taking this case was as great as they now suggest.

14   In an interview about their practice in June 2014, Sherwin told

15   the reporter, "We screen probably a few hundred cases before we

16   take a case.  Because we don't get paid unless we win and we pay

17   all the litigation costs, we have to be very, very selective."

18   (Haddad Decl. Ex. A (Docket No. 181-1).)  An attorney with a fee-

19   paying client may elect to take an extremely risky case knowing

20   that he will still be paid.  Here, however, counsel's screening

21   of cases and the overall facts of this case do not suggest that

22   they perceived a great risk in taking this case that merits a

23   significant multiplier to account for the contingency.

24        3.  <u>Conclusion</u>

25        Overall, the court finds that a significant reduction

26   is merited based on plaintiff's limited success and the lack of a

27   tangible public benefit from the verdict.  The court will off-set

28   this reduction only slightly to account for an enhancement under

28

1  California law for the contingent nature of this case.

2  Accordingly, the court will reduce the lodestar amount by 45%,

3  which is calculated as follows:

4      Haddad:      493      x    $400 =    $ 197,200

5      Sherwin:     301.7    x    $280 =    $ 120,680

6      Guertin:     281      x    $175 =    $  49,175

7      Helm:        306.6    x    $150 =    $  45,990

8      Altomare     7.2      x    $150 =    $   1,080

9      Paralegals   126      x    $ 75 =    $   9,450

10     TOTAL                                $ 423,575

11     Less 45% Reduction                   $-190,608.80

12     **LODESTAR CALCULATION:**       **=    $ 232,966.30**

13     B.    Adjustment to the Lodestar

14          Once the court has computed the lodestar, there is a

15  "'strong presumption' that the lodestar is the reasonable fee."

16  Crawford v. Astrue, 586 F.3d 1142, 1149 (9th Cir. 2009) (quoting

17  City of Burlington v. Dague, 505 U.S. 557, 562 (1992)).  The

18  Ninth Circuit has emphasized, however, that the district court

19  must consider "whether it is necessary to adjust the

20  presumptively reasonable lodestar figure on the basis of the Kerr

21  factors that are not already subsumed in the initial lodestar

22  calculation."  Morales, 96 F.3d at 363-64 (citations omitted).

23  "The court should consider the factors established by Kerr, but

24  need not discuss each factor."  Eiden v. Thrifty Payless Inc.,

25  407 F. Supp. 2d 1165, 1168 n.4 (E.D. Cal. 2005) (Shubb, J.)

26  (citing Sapper v. Lenco Blade, Inc., 704 F.2d 1069, 1073 (9th

27  Cir. 1983)).

28          Plaintiff's counsel seek an enhancement based on "the

29

1   extent to which the nature of the litigation precluded other

2   employment by the attorneys." Serrano v. Priest, 20 Cal. 3d 25,

3   49 (1977); see also Kerr, 526 F.2d at 670 (identifying "the

4   preclusion of other employment by the attorney due to acceptance

5   of the case"). Counsel specifically represent that this case

6   required their law firm to "turn[] away at least 2 potential

7   clients over the past year who were prepared to retain [their]

8   firm on an hourly basis at market rates to be negotiated."

9   (Haddad Decl. ¶ 41.) While this factor may weigh slightly in

10  counsel's favor, the court finds that compensating them a

11  reasonable fee for their work adequately accounts for any other

12  loss of income and thus the inability to take other clients does

13  not merit a multiplier.

14        Nor does the court find that the "undesirability" of

15  this case merits an enhancement. While plaintiff's counsel may

16  be correct in arguing that police misconduct cases generally are

17  "difficult to win," one of the central difficulties often arises

18  from the fact that the plaintiff's own criminal conduct led to

19  the challenged encounter with the police. Here, plaintiff was a

20  disabled veteran who had not engaged in any criminal activity at

21  the time of the stop. The minor driving infractions leading to

22  the stop weighed strongly in plaintiff's favor when assessing the

23  objective reasonableness of Plumb's use of force and likely made

24  plaintiff more sympathetic in the eyes of the jury. Cf. Wilcox,

25  42 F.3d at 557 (highlighting plaintiff's "overall success" in

26  light of the fact that plaintiff's counsel "persevered despite

27  the fact that their client was unsympathetic: The video of the

28  incident--a central piece of evidence at trial--showed Wilcox

1  drunk, verbally abusive, and uncooperative" and "the jury was

2  informed that Wilcox, just prior to his arrest, had broken a

3  glass or a beer bottle on a woman's face, and had also been

4  convicted of several felonies and was incarcerated at the time of

5  the trial").

6       Accordingly, the court finds that the lodestar

7  calculation is reasonable and none of the remaining Kerr factors

8  merit a reduction or enhancement of the lodestar.

9       C.   Fees on Fees

10      In addition to fees awarded for success in the

11 litigation, a prevailing party under § 1988 is also entitled to

12 recover fees for work performed in preparing the motion for

13 attorney's fees itself.  Camacho v. Bridgeport Fin., Inc., 523

14 F.3d 973, 980 (9th Cir. 2008) ("In statutory fee cases, federal

15 courts, including our own, have uniformly held that time spent in

16 establishing the entitlement to and amount of the fee is

17 compensable." (citing In re Nucorp Energy, Inc., 764 F.2d 655,

18 659-60 (9th Cir. 1985)).  "Attorney's fees requests for work

19 litigating attorney's fees are treated the same as for work done

20 on the merits of a case."  Winterstein v. Stryker Corp. Grp. Life

21 Ins. Plan, 262 Fed. App'x 841, 843 (9th Cir. 2008) (citing

22 Thompson v. Gomez, 45 F.3d 1365, 1367-68 (9th Cir. 1995)); see

23 also Camacho, 523 F.3d at 982-83 (emphasizing that district

24 courts must apply the lodestar approach when awarding fees on

25 fees).

26      Here, plaintiff seeks $84,865 in attorneys' fees for

27 work done to prepare his motion for attorney's fees and reply in

28 support of it.  Most of these fees account for the 74.8 hours

1    attorney Richard Pearl spent on the fee motion at a rate of $700

2    per hour.  Haddad indicates he spent 28 hours on the fee motion

3    and Sherwin indicates she spent 31.1 hours on the fee motion.

4          Pearl is an outside counsel retained to work

5    exclusively on the fee motion and Plumb objects to his retention

6    and recovery of any fees.  Pearl has 46 years of experience and

7    has previously prepared over 140 fee applicants for attorneys,

8    including working with Haddad and Sherwin on previous fee

9    motions.  (Pearl Decl. ¶ 5.a.)  Plaintiff's counsel also explain

10   that they have less experience with the legal issues governing

11   fee motions and were committed to other cases when the work on

12   the fee motion needed to be completed.

13         Plumb has not cited any authority precluding an

14   attorney from retaining separate counsel to work on the fee

15   motion.  A fee motion, however, is less complex and novel than

16   most civil rights cases and there is no reason that plaintiff's

17   counsel would have been unable to handle the issues raised in the

18   motion without the assistance of an attorney who specializes in

19   fee motions.  Nor does it appear that Pearl's involvement in the

20   fee motion increased the amount of fees plaintiff's counsel

21   recovered.  In fact, when compared to the original award counsel

22   requested, their success in this motion, like the trial, was

23   substantially limited.  Nonetheless, because Haddad and Sherwin

24   could have performed all the work necessary to seek their fees,

25   the counsel they retained so that they could work on other

26   matters should not receive a greater fee than Haddad and Sherwin

27   would have received if they performed the work themselves.  The

28   court therefore finds that Pearl is entitled to reimbursement for

1   his work on the fee motion at a rate of $400 per hour.

2          In addition to the 74.8 hours Pearl claims he worked on

3   this motion, Haddad expended 28 hours and Sherwin expended 31.1

4   hours preparing the fee motion.  This totals 133.9 hours on the

5   fee motion alone.  When Haddad and Sherwin have submitted

6   numerous fee declarations, including some with declarations very

7   similar to the ones submitted in this case, 133.9 hours is beyond

8   excessive.  Moreover, while the Ninth Circuit has recognized that

9   civil rights attorneys working on a contingency have little

10  motive to expend unnecessary hours, Blackwell, 724 F. Supp. 2d at

11  1080, their payday is essentially guaranteed by the time the fee

12  motion comes around.  The court cannot help but question whether

13  the fact that Plumb was now required to foot the bill might have

14  encouraged counsel to spend more time than necessary on the fee

15  motion.  The Supreme Court has also recognized that "[a] request

16  for attorney's fees should not result in a second major

17  litigation."  Hensley, 461 U.S. at 437.

18          The court will therefore deduct 50 hours from Pearl's

19  time, 4 hours from Haddad's time, and 4 hours from Sherwin's

20  time.  This provides a total of 75.9 hours of attorney time on

21  the fee motion, which the court believes is more than adequate to

22  provide counsel with a reasonable fee for work on this motion.

23  The fee award for plaintiff's fee motion therefore totals

24  $30,360.

25  III.  Expenses

26          "Under § 1988, the prevailing party may recover as part

27  of the award of attorney's fees those out-of-pocket expenses that

28  would normally be charged to a fee paying client."  Dang, 422

33

1    F.3d at 814 (citations omitted).  "Such out-of-pocket expenses

2    are recoverable when reasonable."  Id.  Here, plaintiff seeks

3    costs in the amount of $40,928.51.

4         Most of Plumb's objections to plaintiff's requested

5    expenses rely on the statutory limitations of costs taxed under

6    28 U.S.C. § 1920.[7]  Reasonable expenses under § 1988, however,

7    "are greater than taxable costs" and thus plaintiff is not

8    limited to costs recoverable under § 1920.  Harris v. Marhoefer,

9    24 F.3d 16, 20 (9th Cir. 1994); see, e.g., Kalitta Air L.L.C. v.

10   Cent. Tx. Airborne Sys. Inc., 741 F.3d 955, 958-59 (9th Cir.

11   2013) (discussing the limitations of taxable costs under § 1920).

12        Plumb also objects to various expenses that courts have

13   routinely granted under § 1988.  See Harris, 24 F.3d at 19-20

14   (affirming an award of expenses under § 1998 that included

15   expenses for "service of summons and complaint, service of trial

16   subpoenas, fee for defense expert at deposition, postage,

17   investigator, copying costs, hotel bills, meals, messenger

18   service and employment record reproduction"); Int'l Woodworkers

19   _____

20        [7]    Federal Rule of Civil Procedure 54(d)(1) and Local Rule
     292(f) govern the taxation of costs to losing parties, subject to

21   limits set under 28 U.S.C. § 1920.  See 28 U.S.C. § 1920
     (enumerating taxable costs).  Plaintiff is seeking expenses under

22   § 1988, not the more limited costs under § 1920.  See Grove v.
     Wells Fargo Fin. Cal., Inc., 606 F.3d 577, 580 (9th Cir. 2010)

23   ("We rejected the defendant's argument that costs should be
     limited to those available under § 1920, explaining that the

24   defendant 'fails to see that . . . travel expenses were not
     granted as costs under section 1920, but rather as out-of-pocket

25   expenses, compensable under section 1988.'" (quoting Davis v.
     Mason County, 927 F.2d 1473, 1488 (9th Cir. 1991))).

26        That plaintiff did not file a Bill of Costs does not
     preclude plaintiff from seeking expenses under § 1988.  See

27   Harris v. Marhoefer, 24 F.3d 16, 19-20 (9th Cir. 1994) (rejecting
     a similar argument).

28

                                  34

1   of Am., AFL-CIO, Local 3-98 v. Donovan, 792 F.2d 762, 767 (9th

2   Cir. 1985) ("[C]osts for telephone calls, postage, air courier

3   and attorney travel . . . are ordinarily billed to a client [and]

4   are routine under all other fee statutes."); POM Wonderful LLC v.

5   Ocean Spray Cranberries, Inc., No. Civ. 09-565 DDP RZx, 2012 WL

6   4936470, at *1 (C.D. Cal. Oct. 17, 2012) (allowing prevailing

7   defendant to recover costs incurred for trial presentation

8   expenses); Miller v. Schmitz, No. Civ. 1:12-00137 LJO SAB, 2014

9   WL 642729, at *5 (E.D. Cal. Feb. 18, 2014) (awarding costs for

10  court costs, service fees, deposition transcript expenses, copy

11  expenses, [] witness fees, . . . costs for an investigator, [and]

12  hotel expenses incurred in connection with a deposition");

13  Mitchell Eng'g v. City & County of San Francisco, No. Civ. 08-

14  04022 SI, 2011 WL 1431511, at *8 (N.D. Cal. Apr. 14, 2011)

15  (awarding transcript costs); cf. United Steelworkers of Am. v.

16  Phelps Dodge Corp., 896 F.2d 403, 407 (9th Cir. 1990) ("We see no

17  reason why [] hours [expended on a moot court trial run] cannot

18  be included in a fee award as long as the number of hours spent

19  was reasonable.").

20          There are several expenses, however, that the court

21  finds unreasonable.  First, because counsel's office is located

22  in Oakland, plaintiff included hotel expenses during trial.

23  While it seems to be generally accepted to charge a client to

24  stay overnight in Sacramento during trial even when the

25  attorney's office is in the Bay Area, it is not reasonable to

26  also charge the client for the attorney to stay in Sacramento

27

28

35

1   over the weekend.  The court will therefore deduct $869.04[8] from

2   plaintiff's expenses.  The court also finds that the expense of

3   $225.54 for a meal with plaintiff's expert over the weekend is

4   not reasonable.  The court will also exclude $161.50 for office

5   supplies, such as post-it notes, sharpie pens, and a video cord

6   adaptor.  (Docket No. 184-9 at 20; Docket No. 184-11 at 25-27);

7   cf. Missouri v. Jenkins by Agyei, 491 U.S. 274, 287 (1989) ("The

8   safeguard against the billing at a profit of secretarial services

9   and paper clips is the discipline of the market.").  Lastly, the

10  court will not include the requested expense of $1,437 for trial

11  transcripts as plaintiff incurred that expense in connection with

12  the pending appeal and it is yet to be determined which party

13  will prevail on appeal.

14          Similar to attorney's fees, "the district court may

15  reduce costs to reflect limited success on the merits, but that

16  it is not required to do so if such costs are sufficiently

17  related to the plaintiffs' successful [] claim."  Cummings v.

18  Connell, 316 F.3d 886, 899 (9th Cir. 2003).[9]  Although all of

19  plaintiff's claims arose from a single incident, the trial

20  definitely would not have lasted as long as it did if plaintiff

21          [8]     From the numerous bills plaintiff submitted, it is
22  difficult to confirm that plaintiff billed for the weekends and,
    if so, the exact amount.  Because Plumb objected to this expense
23  and plaintiff did not respond to or dispute Plumb's
    representation, the court deducted $107 per night for the rooms,
24  $12.84 per night for taxes, and $25.00 per day for parking.

25          [9]     Although it is not clear from the Ninth Circuit's
26  decision, the district court in Cummings had awarded costs under
    § 1988.  See Cummings, 177 F. Supp. 2d at 1089.  The Ninth
27  Circuit's indication on remand that "the district court may
    reduce costs to reflect limited success on the merits" thus
28  applied to expenses awarded under § 1988.

                                  36

1  had not pursued his unsuccessful claims against Brame and the CHP

2  or challenged the arrest for driving under the influence.  In

3  light of this limited success, the court finds that a 25%

4  reduction to plaintiff's expenses is appropriate.  Accordingly,

5  the court will permit plaintiff to recover $28,676.57 in

6  expenses.

7          In sum, the court will award $292,002.87 in attorney's

8  fees and expenses, calculated as follows:

9      Lodestar:                          $ 232,966.30

10     Fees on Fees                       $  30,360.00

11     Expenses:                          $  28,676.57

12     TOTAL AWARD:                       $ 292,002.87

13         IT IS THEREFORE ORDERED that plaintiff's motion for

14  attorney's fees and costs be, and the same hereby is, GRANTED in

15  the amount of $292,002.87.

16  Dated:  December 21, 2015

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE